T. A. McCALL, Appellant, *v.* O. H. CARLSON and
FREDA CARLSON, Respondents.

No. 3457

August 22, 1946.                               172 P. 2d 171

*Lowell Daniels*, of Tonopah, *Peter Breen*, of Goldfield, and *Guy Preston Greenwald, Jr.*, and *A. P. G. Steffes*, both of Los Angeles, California, for Appellant.

*William J. Crowell*, of Tonopah, and *Buel R. Wood*, of Los Angeles, California, for Respondents.

## OPINION

By the Court, HORSEY, J.:

The facts as proven by the evidence and upon the basis of which the questions to be determined on this appeal are predicated are substantially as follows:

On February 25, 1937, and prior thereto, the appellant, T. A. McCall, was the owner and in possession of 640 acres of land in Nye County, Nevada, being the same land described in paragraph IV of plaintiff's complaint and which is the subject matter of this action. On the above-mentioned date, the appellant purchased some mining equipment of the respondents, and, to secure the payment of a balance in the sum of $1,800 due upon the purchase price of same, executed, in favor of respondent, Freda Carlson, a mortgage upon said land, to secure

a note payable on or before two years from date, with interest at six percent (6%) per annum, payable semi-annually.

McCall did not pay anything on the indebtedness secured by the mortgage, except that, in connection with a transfer of certain equipment, at O. H. Carlson's instigation, to a man in Arizona, McCall was credited, upon the interest, with the sum of $125.

On June 9, 1941, the principal of the indebtedness, together with interest thereon, and the amounts of taxes which had been advanced by the respondents, was past due and remained unpaid.

About ten days prior to said last-mentioned date. O. H. Carlson and McCall had a conversation, in which, according to McCall's testimony, from which we quote, "Carlson just said that the mortgage was in bad shape, and that he wanted me to give him a quitclaim deed and he would give me an option to purchase back and a lease on it and I would remain in possession of it and so on, and I just considered it was putting it in another form."

In his further testimony, the following questions were asked, by Mr. Breen, and answers given by Mr. McCall:

"Q. What happened with reference to this mortgage, if anything, at that time? (Referring to June 9, 1941.) A. I gave Mr. Carlson a quitclaim deed and he gave me an option to purchase with a lease, I believe, and incidental papers. It was an arrangement he wanted to make.

"Q. Just immediately prior to the execution of the deed you speak of, did you have any conversation with either of the Carlsons with reference to the transaction? A. Yes, with Mr. Carlson.

"Q. State the place and time as near as you can remember. A. I usually talked with Mr. Carlson at his home in the evenings. I don't recall the exact conversation, but the gist of it was that he wanted to get the mortgage in better shape. He wanted me to give him a quitclaim deed and take back an option to purchase with a lease."

As to the conversation at the time, or shortly before, the deed was executed by McCall and the lease and option was executed by the Carlsons, O. H. Carlson upon being asked, by Mr. Wood, his attorney, to relate the conversation, testified as follows:

"Well, before that thing come on here, we talked it over a time or two and there was some two or three hundred dollars taxes due and as it would cost some four hundred dollars to foreclose, we talked it over and we decided that he would give me a deed and I would pay up the taxes and I say there is four hundred dollars if he take up the option and if he don't take up the option I have the four hundred, and he would pay the interest same as he had been doing. And I told him when we made up the papers, 'Now, if you don't take up the option when due, you have no land, Tex, because you never pay me and I do not want things that way. You have to take up that option when due or you will be out, the land will be mine. There will be no extension.' It had been dragging along too long, and he agreed on that. 'If I don't take up the option,' he said, 'the land is yours.' "

T. A. McCall, the appellant, and O. H. Carlson and Freda Carlson, the respondents, met on June 9, 1941, by appointment, at Mrs. P. H. Harding's home, 2128 Reservoir Street, Los Angeles, Calif. Mrs. Harding was in the insurance business and a notary public. At that time and place, the appellant executed a quitclaim deed to said land, to O. H. Carlson and Freda Carlson, the respondents. Said deed was dated the 9th day of June 1941, was then and there acknowledged before P. H. Harding, notary public, and was delivered to respondents on said June 9, 1941. A certified copy of said deed was admitted in evidence as plaintiff's exhibit "H."

Contemporaneously with the execution and delivery of said quitclaim deed, Mrs. Harding, at the request of Mr. Carlson, wrote a receipt or release (defendant's exhibit 2), which was, then and there, executed by respondents, Freda Carlson and O. H. Carlson, and delivered to appellant, T. A. McCall, and is as follows:

"In lieu of quitclaim deed given by T. A. McCall to O. H. Carlson and Freda Carlson this 9th day of June, 1941, we hereby release T. A. McCall from any further obligation on a certain note for Eighteen Hundred & no/100 Dollars ($1800.00), made the 25th day of February, 1937.

"Signed    Freda Carlson
"O. H. Carlson"

On the same occasion, when said parties were present at Mrs. Harding's, a document entitled, "Lease and Option to Purchase" was signed by O. H. Carlson, Freda Carlson, and T. A. McCall, and was then and there acknowledged by said parties before Mrs. Harding, notary public. Said document was admitted in evidence as plaintiff's exhibit "I," and that portion thereof constituting such "Option to Purchase" is as follows:

"In consideration of the sum of Three Dollars ($3.00) receipt of which is hereby acknowledged, Lessors agree that at any time during the term of this lease Lessee may purchase the above described property and Lessors agree to sell said property to Lessee for the sum of Two Thousand Two Hundred and Ninety Dollars ($2,290.00) and interest to date of payment, plus whatever taxes levied and assessed upon said property were paid by the Lessors. If the Lessee's option is exercised, the total of said purchase price shall be paid on or before December 5, 1942, in the following manner:

"Lessee shall pay to Lessors, on or before June 5, 1942, the sum of One Thousand One Hundred and Forty-Five Dollars, $1,145.00), at Six Per Cent (6%) per annum from the date of this lease and interest to the date on which said payment is made, plus whatever taxes levied and assessed upon said property were paid by the Lessors; and the balance of said purchase price shall be paid on or before December 5, 1942.

"If Lessee fails to pay the above installments, or either of them promptly, when the same becomes due, this lease and option shall immediately terminate and

becomes void and in the event of the refusal or failure of the said Lessee to surrender and deliver up immediate possession of the said real property upon the termination of said lease and option, and it should become necessary to institute a suit or action for the immediate possession of said real property, or to terminate said lease and option, then and in the event the said Lessees agree to pay unto the said Lessors such sum as the Court shall adjudge reasonable as attorney's fee in said suit or action.

"All of the terms and provisions of this lease and option shall be binding upon the parties hereto, their heirs, successors and assigns.

"In witness whereof, the parties hereto have hereunto set their hands the day and year first above mentioned."

It appears from the testimony of the appellant that in May 1942, and shortly prior to the time when the first installment of $1,145, by the terms of the option, would become due, on June 5, 1942, appellant had a conversation with respondent, O. H. Carlson. In that connection, appellant testified as follows:

"I told Mr. Carlson, I told him I had some money coming in in which case I wanted to clean it up and if I did not have I had arranged to borrow the money to pay on it. In which case I wanted to put it through escrow; in any case I wanted to put it through escrow. I wanted to know at that time if he was agreeable to such an arrangement. He said he was, that he wanted to do anything to help, that he wanted the money, not the land. He said he wouldn't pay any attention to the due date, and I said I wanted to pay it all off and all I wanted to know was that he hadn't encumbered the title and that is why I wanted to put it in escrow. And it was put in escrow later. That is the gist of my conversations with Mr. Carlson, and then, I think I told him that we would be ready to go to escrow in a day or two, or a few days, and I think on, along about, I am recalling it from memory, and basing it on the date of a letter from Mr.

Walden, and I think on May 2nd I phoned and asked if he would be ready to go to escrow in the morning, and Mrs. Carlson answered the phone and informed me that Mr. Carlson had been called out of town suddenly and would be gone possibly a week or ten days and that he had appointed an attorney to take care of the matter, and she gave me the attorney's address, a Mr. Walden * * *."

After learning from Mrs. Carlson that Mr. Carlson was out of town, and being referred, by her, to Mr. Walden, their attorney, the appellant went to Mr. Walden's office, introduced himself, and (according to appellant's testimony) asked Walden to go to escrow with him. Walden informed appellant that he did not have any authority to go to escrow. The appellant asked Walden to write a letter to Salisbury, which Walden did. Said letter was dated May 23, 1942, was admitted in evidence, and was as follows:

"Dear Sir:

"Mr. McCall is in my office Re: Carlson escrow, but I have just told him that I have no authority to enter into any escrow, but this is how the matter stands with me: Mr. Carlson said 'Tell the boys to put up their money and I will be in later and complete the transaction.' I am sorry that I cannot do more to help you, but I cannot act without some authorization.

"Very truly,

"Frank W. Walden."

On June 1, 1942, an escrow was opened with Title Guarantee & Trust Company, Los Angeles, California. Stuart M. Salisbury, a witness for plaintiff, testified that he, Salisbury, deposited with said title company, in said escrow, $3,000, in the name of C. M. Gregg; that half of the money was his, Salisbury's. It appears that Gregg and Salisbury had a transaction pending with the appellant, T. A. McCall, in which they had agreed to loan McCall $4,048.17 and take a note therefor, secured by a

deed of trust upon the said Nye County, Nevada, property, and other property, provided their requirements as to title, etc., were complied with. And it appears, from the escrow instructions, that when such conditions were met the Title Guarantee & Trust Company was authorized to pay respondents, O. H. and Freda Carlson, the sum of $2,290, plus the amounts due respondents for interest and advancements in payment of taxes; that is to say, the amounts provided by the lease and option agreement to be paid respondents if the appellant exercised his option to purchase the Nevada property.

The escrow opened June 1, 1942, was thus a three-way escrow and related, also, to property other than the said Nevada property, said other property being included in the transaction between Gregg and Salisbury, on the one hand, and McCall, on the other.

The escrow instructions disclose several conditions precedent to the right of the escrow holder to pay the amounts to the Carlson's provided by the option.

E. H. Booth, Jr., vice president of Title Insurance & Trust Company (successor in interest, in the matter of said escrow, to Title Guarantee & Trust Company), in response to questions by Mr. Greenwald, testified concerning these conditions, as follows:

"If I understand your question correctly, the instructions here provide that we can use the money when we can issue a policy or obtain a policy of Title Insurance from the Pioneer Title Insurance & Trust Company showing title to certain property in Nye County, Nevada, which is specifically described in the escrow instructions, vested in T. A. McCall, a married man, subject to taxes, covenants, conditions, restrictions, reservations, easements, rights of way of record, all of which are subject to Mr. McCall's approval, such as other conditional encumbrances as he might approve, and a trust deed to be filed for record securing a note for $4,040.17."

In response to a further question from Mr. Greenwald, Mr. Booth said it was to be a three-way escrow.

It appears from the escrow instructions and from Booth's testimony that the following conditions had to be met before the purchase money for the Nye County, Nevada, property could be "used," that is, delivered to the respondents:

Such instruments would have to be procured by the escrow holder as would enable it to procure, in turn, from Pioneer Title Insurance & Trust Company a joint protection policy of title insurance in the usual form, with the liability limited to $4,000, covering the Nye County property, showing title to said property vested in T. A. McCall, subject to taxes, covenants, conditions, restrictions, and reservations, also all encumbrances upon the property as shown in the policy, all of which were subject to Mr. McCall's approval, and a trust deed to be filed for record, securing a note for $4,048.17 (this amount is stated in the escrow instructions; the amount according to the record of Mr. Booth's testimony is $4,040.17).

Therefore, it would be necessary for the escrow holder, before paying any money to respondents, to have the following:

1. A report on the title, sufficient to enable it to procure from Pioneer Title Insurance & Trust Company the requested policy of title insurance.

2. A deed from O. H. Carlson and Freda Carlson to T. A. McCall, of said Nye County, Nevada, property, delivered and recorded, in order to show title vested in T. A. McCall, as required.

3. Approval of McCall as to any and all covenants, restrictions, reservations, easements, rights of way of record, and as to all encumbrances upon the property.

4. A trust deed from McCall, duly executed.

O. H. Carlson testified, with respect to the note secured by the mortgage, that, subsequent to execution of the receipt or release, on June 9, 1941, he went to the bank, got the note out of the vault, and wrote across the whole note, "Paid in full," and mailed it to McCall.

The latter testified he never received the cancelled note, but acknowledged having received the receipt or release, and said same had been placed with his attorney.

On June 3, 1942, the Title Guarantee & Trust Company addressed a letter to Mr. Carlson, which was as follows:

"Escrow Department                         .     June 3, 1942
"Re: McCall                                      Special Delivery
"Mr. O. H. Carlson
   "2436 Echo Park Avenue
   "Los Angeles, California
"Dear Mr. Carlson:

"This is to advise you that escrow instructions have been prepared at the request of Mr. T. A. McCall covering a sale of certain property located in Nye County, Nevada, from yourself to him, for a consideration of $2719.45, plus interest on various amounts advanced by you to date of close of escrow.

"The escrow instructions are dated June 1, 1942, and sufficient money has been deposited on June 1, 1942, in this escrow to comply with the instructions given by Mr. McCall. We, therefore, suggest that you stop at this office at your convenience to read and sign, if satisfactory, the escrow instructions which we have prepared and which are signed by Mr. T. A. McCall.

   "Very truly yours,

                   "C. B. Crawford
                   "Escrow Department.
"CBC: JT
"CC: Mr. Frank W. Walden
"CC: Mr. T. A. McCall"

Carlson in his testimony, admitted the receipt of said letter, and testified, in part, as follows:

"Well, Mr. Walden, the attorney, he drew up a quitclaim deed from my wife and myself to Mr. McCall and acknowledged it on the 5th day of June. It was due, and the 6th Mr. Walden and I went down to the Title

Company and told them we had a quitclaim deed and he could pay half or the whole. If he give all we give him the deed and if he give half we give him a receipt. He said, 'We have no money to give you. We have an escrow if you want to sign it,' he said. Mr. Walden says then, 'Do not sign no escrow. Do not sign anything. It is up to them to give you the money on this option.' Mr. Walden was with me. Mr. Walden was the one who told the Title Company and he told me he would have to pay off on the option, and provided he give all the money we would give him the deed."

The quitclaim deed drawn by Mr. Walden, and referred to by the respondent, Carlson, in his foregoing testimony, was admitted in evidence as defendant's exhibit 5, and is in words and figures as follows:

"Quit Claim Deed

"In consideration of Ten Dollars ($10.00) receipt of which is hereby acknowledged, the undersigned, O. H. Carlson and Freda Carlson, husband and wife, do hereby quitclaim unto T. A. McCall all their right, title and interest in and to all that real property in the County of Nye, State of Nevada, described as (description of property)

"Witness our hands this 5th day of June, 1942

"O. H. Carlson
"Freda Carlson."

(Acknowledgment by respondents before Frank W. Walden, notary public, on June 5, 1942.)

The appellant acknowledged having received, shortly after June 18, 1942, from the respondents, a document entitled "Notice of Cancelation of Lease—Withdrawal of Option to Purchase, and Demand for Possession." This document noticed McCall that the said lease and option to puchase was cancelled and withdrawn, due to his failure to exercise said option within the time and in the manner prescribed therein, and made demand for possession of the said land situated in Nye County,

Nevada, describing it therein. The said document was dated the 18th day of June, 1942, and was signed by O. H. Carlson and Freda Carlson.

On July 18, 1942, the appellant commenced this action, in the district court of the Fifth judicial district of the State of Nevada, in and for the county of Nye. It is a suit in equity, and the plaintiff (appellant herein), in his complaint, alleged, "that the plaintiff is ready to pay to said defendants, O. H. Carlson and Freda Carlson, whatever may be justly due on said loan and hereby offers to bring the money into Court for that purpose."

In the prayer of his complaint, appellant, among other things, prays that "an account may be taken of the amount due said defendants, and that upon the payment by plaintiff of the amount so found due, said defendants be required to reconvey said premises to the plaintiff * * *." The plaintiff prayed, also, for general relief.

Issue was joined by the pleadings, and the case was tried by the court, sitting without a jury, commencing April 9, 1945.

Thereafter, on the 16th day of May, 1945, the said district court, the Honorable Wm. D. Hatton, District Judge, rendered and filed its decision in favor of defendants (respondents) and against plaintiff (appellant), on the plaintiff's alleged causes of action, and in favor of respondents in their cross action, wherein they sought to quiet their title to the land in question. On June 26, 1945, the said district court made and filed that court's findings of fact and conclusions of law.

In its findings and conclusions, the court found and concluded, among other things, as follows:

"Findings of Fact

\*　　\*　　\*　　\*　　\*　　\*　　\*

"IV. That it is true that the amounts agreed to be paid in said lease and option to purchase were not paid in the manner and according to the terms agreed upon, or at all.

"V. That it is not true that plaintiff, T. A. McCall,

made a due and timely tender of the amount or amounts according to the terms of said option, or at all.

"VI. That it is not true that to evidence said mortgage, and in lieu thereof, plaintiff, T. A. McCall, executed and delivered to the defendants the quitclaim deed designated, 'Exhibit 2' attached to said complaint, but it is true that said quitclaim deed was executed and delivered by the plaintiff, T. A. McCall, and accepted by the defendants and cross-complainants in full and complete settlement of the debt secured by said mortgage, and it is further true that in the execution delivery and acceptance of said quitclaim deed the indebtedness evidenced by said mortgage was wholly discharged and liquidated.

"VII. That it is true that the defendants and cross-complainants, O. H. Carlson and Freda Carlson, from and after June 5, 1941, have been the owners of said lands and premises.

\* \* \* \* \* \* \*

"Conclusions of Law

"As a Conclusion of Law from the foregoing facts the court finds that the defendant and cross-complainants are the owners of and entitled to the possession of the lands and premises described and fully set out in the complaint and cross-complaint on file herein."

On said June 26, 1945, judgment quieting title to said land in respondents was rendered by said court, and duly entered.

The appellant, in due time, moved the court for a new trial, on the grounds of the insufficiency of the evidence to justify the decision of the court and that the said decision is against law, and the said motion was denied.

The appeal to this court is from the said judgment and the order denying appellant's motion for a new trial.

Two assignments of error are presented by appellant:

"1. The evidence is insufficient to support the court's finding that appellant did not make a due and timely tender of the amount or amounts according to the terms

of respondent's agreement to sell the lands in question to him, and that said finding is contrary to the uncontradicted evidence in the case.

"2. That the decision and judgment of the court are against law."

It appears, from appellant's assignments of error, that he relies entirely upon the sufficiency and the timeliness of the alleged tender, by the deposit of $3,000 with the Title Guarantee & Trust Company, by Messrs. Salisbury and Gregg, to sustain his contention that equity should intervene and permit him to carry through to completion the repurchase of the said lands.

That the appellant intended to abandon the position he had advanced in the district court, that the quitclaim deed from appellant to O. H. Carlson and Freda Carlson was intended merely as a continuation, in a different form, of security for the indebtedness, and, therefore, was an equitable mortgage, appears from the following statement on page 3 of appellant's opening brief:

"In his complaint (Tr. vol. II, pp. 94–105, folios 1–34), appellant alleged, and at the trial contended, that this quitclaim deed from appellant to respondents was in fact an equitable mortgage. The trial court, however, decided this question adversely to the contentions of appellant. We are not, on this appeal, urging that the trial court incorrectly decided this issue, and for that reason we shall adopt such theories in our discussion here as are consistent with the court's findings of fact and conclusions of law on this point."

Whilst appellant has doubtless endeavored, in his argument, to adhere consistently to his foregoing statement of purpose, which clearly means that he would no longer contend that said deed was for security only, and was, in effect, an equitable mortgage, appellant, nevertheless, in his brief, has advanced theories and made statements contending against forfeiture and for a construction of his rights under the option as being more in the nature of an equity of redemption than a bare

option right of purchase according to its terms, that could be sustained only upon the theory of the continuation of the mortgage relationship between appellant and respondent.

For instance, on page 23 of his opening brief, appellant's attorneys have stated:

"The legal maxim that 'equity abhors a forfeiture' hardly needs the citation of any authority. This is not a case where an optionee had acquired an option to purchase property which he never owned. Here, the situation is more analogous to a case where a landowner, after a foreclosure, has an equity of redemption. * * *"

That the appellant is still adhering to the theory of "equitable mortgage" is further manifested by the statement on page 7 of his closing brief, as follows:

"The case at bar does not, therefor, fall within the option cases, such as the case of Bourdieu v. Baker, [infra]. It falls within the class of cases where the owner of property is attempting to avoid a forfeiture of his property. * * *"

The appellant's attitude in this respect impels us to pass upon the question of whether or not the quitclaim deed executed June 9, 1941, conveying said property from appellant to respondents, was intended as an absolute conveyance in consideration and payment of the antecedent indebtedness, or whether the parties merely placed the matter in a different form, and intended the indebtedness to continue and the title conveyed by the quitclaim deed to be held by respondents merely for security, as the mortgage had been.

■■ It is necessary to pass upon this fundamental question, in order to dispose of appellant's said contention, for the reason that, unless the indebtedness continued and the deed was, in its nature, a mortgage and intended merely for security, there could be no question, upon this appeal, as to equity of redemption or forfeiture of the land involved. An equity of redemption is a final opportunity which equity affords a debtor who has conveyed his property for security, and has defaulted and

suffered foreclosure, to pay the indebtedness and such amounts of interest and costs as will make the creditor whole, and thereby save his property. In such case there has been no intention to part with the property at any time, and the relationship is one of mortgagor and mortgagee. In such case, if a mortgagor fails to redeem within the statutory time, or such time as a court of equity validly decrees, a forfeiture results, and he loses his equitable interest in the land.

■ In case of an absolute and unconditional conveyance of the property, whether in payment of an antecedent debt, or for any other valuable consideration, the title passes to the grantee, by the voluntary action of the grantor, and the full and complete ownership of the property passes, thereby, to the grantee. If as part of the transaction, the grantor takes back from the grantee an option to repurchase, upon certain specified terms and conditions, and fails to comply with such terms and conditions and allows his right under the option to lapse, he has not, thereby, lost or forfeited any interest or equity in the property. By virtue of his conveyance, he has voluntarily parted with all of his interest in the property, and he has no interest left which could be the subject of forfeiture. At most, by his failure to comply with the terms and conditions of the option to reacquire the property, he might be deemed to have forfeited his contract rights under the option; at least, he has permitted same to lapse.

■■ A different situation exists in the case of an agreement whereby the first party agrees to sell, *and the second party agrees to buy,* land (italics ours.) In this latter case, the vendee, as distinguished from the optionee, actually becomes vested with the equitable title to the property, and in the event of his failure to comply with the terms of the agreement he forfeits his equitable title, if the agreement so provides. But an option is merely unilateral. Only the optionor is bound, and merely to the extent to which he has agreed, by the precise terms of the agreement, to be bound. The

optionee has no interest in the property which the optionor has agreed to sell to him, and can only acquire such interest by complying with the terms and conditions of the agreement. If he fails to do so, his contractual right to acquire an interest in the property, by complying with the terms and conditions of the agreement, ceases. He has forfeited, if anything, only his contractual right, but, as above stated, no interest in the property.

In the instant case, in order to determine the intention of the parties, we must look to the surrounding facts and circumstances.

The mortgage had been in effect since February 25, 1937—more than four years—when the parties met in the latter part of May, and, again, early in June, 1941, to discuss the matter.

■ Mr. Carlson, according to the testimony of Mr. McCall, said, in substance, that the mortgage situation was in bad shape, that he wished to get matters in better shape; that taxes were due, and if he foreclosed, there would be a further expense of foreclosure of about $400; that if McCall would deed the property to respondents, respondents would give him back a lease and option, and if he took the property back, he, McCall, would save the $400, and if not, the respondents would save that much; Carlson complained to McCall that he did not pay anything, even the interest and taxes, and said, in effect, he did not like that, and wanted the matter settled. McCall consented to deed the property. The respondents and the appellant met at the home of Mrs. Harding, in Los Angeles, California, June 9, 1941, to execute the necessary papers and close the transaction according to the understanding reached. Mrs. Harding was requested to prepare a paper in the nature of a receipt or a release of the indebtedness for which the mortgage was security. It has, hereinbefore, been set forth in full. It plainly provided that "in lieu" (meaning "in consideration") "of quitclaim deed given by T. A. McCall to O. H. Carlson and Freda Carlson, the 9th day of June, 1941, we

hereby release T. A. McCall from any further obligation on a certain note for Eighteen Hundred & no/100 Dollars ($1800.00), made the 25th day of February, 1937." This instrument clearly discloses that the parties thereby, and by means of the quitclaim deed therein mentioned, intended that, in payment or settlement in full of the indebtedness evidenced by the note, which was secured by the mortgage, McCall was conveying the property to respondents. McCall received the lease and option to purchase, which it was agreed he should have. He no longer was obligated to the Carlsons, to any extent. He owed them nothing. He did not agree, by taking the option, to pay them any money whatever. He merely had the option to buy the property back at a purchase price equal in amount to the former indebtedness plus the interest and taxes that would accrue during the life of the option. If the parties had not intended this transaction to be what it clearly appears to be, from the papers and documents, their statements and the circumstances, but had intended the mortgage indebtedness to continue, they would certainly not have arranged for the deed from McCall to the Carlsons. There would have been nothing to be gained by it, as the Carlsons already had the mortgage. It would have been merely a futile ceremony, by which the Carlsons would have been continued in the mortgage relationship, with which they were dissatisfied. And, certainly, if they were not obtaining title to the property, but a mere mortgage, as they had before, they would not have released the mortgage indebtedness nor have sent McCall his cancelled note. McCall doubtless fully believed that within the year he had in which to make the first payment to repurchase the property, under the option, he would be able to do so, and was willing to rely upon his right to repurchase, under the option. The lease allowed him to remain in possession of the property.

Mr. Pomeroy, the great authority upon subjects relating to equity, in Pomeroy's Equity Jurisprudence, 5th ed., vol. 4, sec. 1195, pp. 575–579, has well stated the

criterion and explained its application as a test of whether a particular transaction is a mortgage or a conditional sale with the right of repurchase, in the following language:

"Sec. 1195. The General Criterion: The Continued Existence of a Debt—Whether any particular transaction does thus amount to a mortgage or to a sale with a contract of repurchase must, to a large extent, depend upon its own special circumstances; for the question finally turns, in all cases, upon the real intention of the parties as shown upon the face of the writings, or as disclosed by extrinsic evidence. A general criterion, however, has been established by an overwhelming consensus of authorities, which furnishes a sufficient test in the great majority of cases; and whenever the application of this test still leaves a *doubt,* the American courts, from obvious motives of policy, have generally leaned in favor of the mortgage. This criterion is the continued existence of a debt or liability between the parties, so that the conveyance is in reality intended as a security for the debt or indemnity against the liability. If there is an indebtedness or liability between the parties, either a debt existing prior to the conveyance, or a debt arising from a loan made at the time of the conveyance, or from any other cause, and this debt is still left subsisting, not being discharged or satisfied by the conveyance, but the grantor is regarded as still owing and bound to pay it at some future time, so that the payment stipulated for in the agreement to reconvey is in reality the payment of this existing debt, then the whole transaction amounts to a mortgage, whatever language the parties may have used, and whatever stipulations they may have inserted in the instruments. On the contrary, if no such relation whatsoever of debtor and creditor is left subsisting, then the transaction is not a mortgage, but a mere sale and contract of repurchase.

"The practical test is whether there is a liability, notwithstanding or independent of the conveyance and contract of reconveyance, which the grantee can enforce

against the grantor. If a loan is made to the grantor at the time of executing the conveyance, and the continued existence of his indebtedness therefor is evidenced by some collateral engagement given by the grantor, such as a note or bond, the case is simple and the transaction is clearly a mortgage. In the second place, if the conveyance is given in consideration of an antecedent debt due from the grantor, and this debt yet remains, so that the grantee may enforce his claim at some time or another against the grantor, the transaction is also a mortgage. But if this antecedent debt is wholly satisfied and extinguished by the conveyance, so that no liability remains under any circumstances against the grantor, then there is no mortgage, since there is no debt to be secured thereby. In such a case the surrender up by the grantee of the written evidences of original indebtedness, or his cancellation thereof, would be very material circumstances. Thirdly, there may be neither a present loan nor an antecedent debt, but the grantee may undertake to assume some outstanding liability of the grantor, or to pay off some claim against the grantor, so that an obligation to reimburse him would rest upon the grantor, and the conveyance may be intended to indemnify the grantee and to secure the performance of the grantor's future continuing obligation, in which case it would clearly be a mortgage."

The case of Tripler v. Campbell, 22 R. I. 262, 47 A. 385, is a case in many respects similar to the instant case, particularly in the fact that in Tripler v. Campbell a deed containing an agreement of defeasance, which was clearly a mortgage, had been given, the money due was unpaid, and the complainant (mortgagor) gave another deed of quitclaim and release to the respondent, taking back another agreement in which complainant agreed to purchase, and respondent to sell the land to the complainant, by the payment of a certain sum on April 15, 1897. We quote from the opinion in that case:

"Notwithstanding this agreement and conveyance, the complainant claims that the respondent still holds only

a mortgage on the property, which he is entitled to redeem. Most of the cases cited by the complainant are those where the only question was whether an original deed was equitably a mortgage, by reason of an agreement of defeasance on payment of a loan for which the deed was security. In such cases courts have held that the deed did not become absolute simply upon default, but that, once a mortgage, it remained a mortgage. Undoubtedly this proposition is correct, at any time prior to foreclosure, because a deed cannot be a mortgage at one time and an absolute deed at another. If the case before us only embraced the first deed, with the agreement of defeasance, the complainant would be entitled to redeem. But that is not the case. A second deed was made by the complainant, and a second agreement made between the parties, after default under the first agreement. The complainant claims that the second deed and agreement were intended to be a mortgage. The court did not find this to be so, as a question of fact, for several reasons. *It would have been an idle ceremony to execute the new deed and agreement, simply to continue a mortgage for the same debt and security.* The complainant testifies that the respondent had started or threatened proceedings, in consequence of which the new papers were made. The plaintiff also testifies that he knew that he released all possible rights in the quitclaim deed of March 2, 1897, and that he had a contract by which he agreed to purchase the land as stated. It would be difficult to draw a contract more explicit or more conclusive of the rights of the parties. The situation and intent of the parties are clear. Default had been made in paying the mortgage debt some weeks before. The mortgagee was adverse to further delay, and was about to take some sort of proceedings. It was therefore agreed that the complainant should release all his rights in the property, which was only a right of redemption as mortgagor, and vest the title absolutely in the respondent, in consideration of which the latter

should give the complainant a right to purchase the estate within a time expressly limited, and declared to be material, after which the agreement was to be null and void. The complainant also agreed to purchase the estate on the terms named, thus showing that he did not understand that it was any longer held merely as security for his debt.

"Under such circumstances, there can be no doubt of the absolute title in the grantee." (Emphasis ours.)

The appellant in the instant case stresses the claim that the consideration, that is, the amount of the antecedent indebtedness, was grossly inadequate, and it would be inequitable to fail to relieve appellant from so great a sacrifice. While there seems to be some disparity between the amount of the indebtedness and the value of the property, the evidence at the trial as to the value was conflicting and not of a character to be entitled to much weight. There was no evidence as to *market* value, or that the property had any certain *market* value. And those testifying as to value had little actual knowledge of the property, and their testimony was largely speculative. (Emphasis ours.) The testimony of the appellant, as to what he paid on the average per acre at a former time, for the land in question and other land, was of little weight as to the value of that particular land at an entirely different time.

We believe that the trial court decided correctly as to the question of the inadequacy of the consideration, and that the reasoning of Judge Hatton was sound.

Having the witnesses before him, and the opportunity of observing their demeanor and manner of giving their testimony, he was in a better position than we are to evaluate such testimony and determine its proper weight. There being a conflict in the evidence as to the question of the adequacy or inadequacy of the consideration, we shall follow the well-established rule and not disturb the findings in that respect, of the trial court, there being substantial evidence to support them.

Anderson v. Fuetsch, 31 Nev. 501, 103 P. 1013, 105 P. 99; Wiggins v. Pradere, 32 Nev. 183, 105 P. 1024.

Other cases in point and germane to the principal question of whether the transaction of June 9, 1941, constituted an absolute sale to respondents with the right in appellant to repurchase the property upon the terms and conditions of the option agreement, or whether said transaction was merely a continuation of the mortgage relationship, with its concomitant right of redemption, are: Jeffreys et al. v. Charlton et al., 72 N. J. Eq. 340, 65 A. 711 (a case quoting a portion of the same criterion, or test, from Pomeroy's Equity Jurisprudence, which we have quoted supra); Shaner v. Rathdrum State Bank, 29 Idaho 576, 161 P. 90; McKinley v. State ex rel. Sageng, Chairman of Rural Credit Dept. et al., 188 Minn. 325, 247 N. W. 389; Holmes v. Warren, 145 Cal. 457, 78 P. 954.

■ The evidence and the surrounding circumstances clearly disclose the intention of the parties that, on the 9th day of June 1941, the mortgage relationship, with its incidental equity of redemption, should cease, and that the respondents, by the force and effect of the quitclaim deed from appellant, should thereupon become vested with such title to the property as the appellant then had; and that the appellant, by virtue of the lease and option to purchase, should thereupon become vested with the right to repurchase the property upon the terms and conditions of their option agreement. This right of repurchase was not greater or different than the right of the optionee in the case of an ordinary or usual contract of such character. No question of forfeiture of the land or as to an equity of redemption was involved, but merely the right of the optionee to reacquire the property he had conveyed, by paying the price of repurchase within the time limited by the agreement. If he so complied, he would thereby have the right to have reconveyed to him such title as he had conveyed to the optionor. If he did not comply with the terms and conditions of the option, such terms and conditions being a

mere offer which he was at liberty to accept or not, as he saw fit, he would have ceased to have any right of repurchase, and the option, by its terms and conditions, would cease and become null and void.

This brings us to the question of whether or not there was a tender by appellant to the respondents of the purchase price of the property, sufficient to constitute a compliance with the terms and conditions of the option. It is admitted there was no direct tender to the respondents by the appellant on or before June 5 or June 6, 1942, of the sum of $1,145, together with the amounts of interest and taxes, as provided by the agreement, or any other sum or sums of money. There was, as hereinabove set forth, a letter from the title company, dated June 3, 1942, to O. H. Carlson, advising him of certain escrow instructions having been prepared at the request of McCall, covering the sale of the said Nye County, Nevada, property from the Carlsons to McCall (we quote from said letter), "for a consideration of $2,719.45 plus interest on various amounts advanced by you to date of close of escrow." We quote further from the said letter, as follows:

"The escrow instructions are dated June 1, 1942, and sufficient money has been deposited on June 1, 1942, in this escrow, to comply with the instructions *given by Mr. McCall.* We, therefore suggest that you stop at this office at your convenience to read and sign, if satisfactory, the escrow instructions which we have prepared and which are signed by Mr. McCall." (Emphasis ours.)

It is stated correctly, we believe, in 17 C. J. S., Contracts, sec. 485, p. 989, that "a tender by a stranger to the contract is invalid."

We believe, however, that in view of certain testimony of McCall to the effect that Carlson agreed, or at least acquiesced, that there could be an escrow, and in view of the above-mentioned letter of Carlson's attorney, Mr. Walden, to Mr. Salisbury, dated May 23, 1942, in which, although Walden stated he was not authorized to enter into any escrow, he stated, also, "Mr. Carlson said, 'Tell

the boys to put up their money and I will be in later and complete the transaction,'" it would seem fair to conclude that respondents acquiesced in a simple escrow. Carlson was temporarily away from the city, and apparently left a message with Mr. Walden to the effect as stated by him in the letter. Doubtless the only sort of an escrow Carlson, in his suggestion to Walden, had in mind, in view of the clear and simple terms of the option, was one in which the money would be deposited, to be paid promptly and unconditionally by the escrow agent upon respondents' depositing in the escrow a good and sufficient quitclaim deed conveying back to McCall the property which the respondents had received from him. Respondents do not appear to have objected to transacting the business through the title company, and the evidence discloses that, accompanied by his attorney, Mr. Walden, whom he had had prepare a quitclaim deed conveying the property back to McCall, Carlson visited the title company's escrow department office, on June 6, 1942, and, according to his testimony (more fully detailed in the foregoing statement of facts herein), he told them (the title company) that they (he and Walden) "had a quitclaim deed and he" (McCall) "could pay half or the whole. If he give all we give him the deed and if he give half we give him a receipt. He" (the title company representative) "said, 'We have no money to give you. We have an escrow if you want to sign it,' he said. Mr. Walden says then, 'Do not sign no escrow. Do not sign anything. It is up to them to give you the money on this option.' * * *" (Parentheses ours.)

As has been pointed out in the statement of facts, on June 2, 1942, $3,000 was deposited with the Title Guarantee & Trust Company by Salisbury, for Gregg and himself, ostensibly to cover the amount to be paid to the Carlsons by McCall, and the escrow instructions were prepared according to McCall's instructions. The numerous requirements and conditions which they contain have, in the foregoing statement of facts, been set

forth. They were calculated to protect, to an extreme degree, the interests of the third parties, Gregg and Salisbury, and, also, the interests of McCall, but little attention seems to have been paid to the limitations and conditions of the option, the rights of the Carlsons in connection with the transaction, or to the adaptation of this third-party deal to such terms and conditions. The requirements and conditions of the escrow were such that on June 1, the date it was opened, or on June 2, the date $3,000 was deposited, it must have been apparent to McCall, Salisbury, Gregg, and the escrow holder that these requirements could not be complied with in time to permit the money to be paid to the Carlsons on June 5.

Appellant's attorneys, in appellant's opening brief, contend that the Carlsons tendered only a quitclaim deed, that appellant, because the Carlsons agreed to *sell* the property to him, was entitled to a warranty deed, and that, because only a quitclaim deed was tendered, McCall then became entitled to a title search to determine the condition of the title, also to determine whether or not the Carlsons had encumbered the property during the one-year period of their ownership. It is not provided in the option agreement that respondents shall convey by warranty deed, and the nature and circumstances of the transaction between McCall and the Carlsons were such that it could not be reasonably required. McCall's conveyance to the Carlsons was by quitclaim deed, which would operate to pass only such title as McCall then had, in settlement of the indebtedness, which latter was a substantial consideration. Certainly, if McCall availed himself of the option right to buy the property back for the same purchase price that the Carlsons had paid for it, with no profit to the Carlsons, he could require no better title than he had furnished them by his quitclaim deed, in the absence of any provision in the option agreement as to title. That McCall expected and required no more than a quitclaim deed is evidenced by his statement in the escrow

instructions (tr., vol. I, folio 214, p. 72), as follows:

"The amount of money which I will hand you to be paid for Deed to file in my favor (*which Deed is to be a Quitclaim Deed*) is $2290.00 plus interest thereon at 6% per annum from June 5, 1941 to date of close of escrow." (Emphasis ours.)

So we cannot agree that McCall was entitled to more than a valid quitclaim deed, duly executed, or that, because the deed tendered by Carlson was a quitclaim deed, McCall was entitled to any additional time in which to make a title search.

■ As to the right to receive the property back free and clear of encumbrances, we agree that, upon compliance by the optionee with the terms of the option, by paying or unconditionally tendering at least one half of the purchase price on or before June 5, 1942, the optionee would have been entitled to the property free from any encumbrances placed there by the Carlsons during the period of their ownership.

This right, however, in the absence of any provision in the option agreement as to encumbrances, or additional time to determine as to them, would not entitle the appellant to additional time to determine, from the records, whether or not the property had been thus encumbered.

It would have been a simple matter to have had the records of mortgages and other encumbrances, of Nye County, searched to the extent of determining whether, during the short period of one year which was involved, there had been any encumbrances placed upon the property. In view of there being no provision as to encumbrances in the option, this search should have been arranged for and accomplished by appellant prior to the time the first payment under the option became due. There was no duty upon the part of respondents, under the terms of the option, to have such search made or to grant any additional time for same.

■ Appellant had merely an option, or a unilateral

agreement, and being in no sense obligated to pay any money or perform any act by virtue of the option, the terms of such an agreement are strictly construed and enforced. The optionor, before acceptance by the optionee, is bound only to the extent that he has expressly agreed to be bound. The obligation on his part is a mere offer, requiring unconditional acceptance in order that a contract may be created. If it were construed otherwise, an optionee could change the time specified for the payment of money, or impose conditions not contemplated by the parties at the time the agreement was entered into, and thereby, without the optionor's consent, foist a so-called contract upon him to which he had not agreed. Fundamentally, the law of contracts does not permit this, as there must be mutuality of consent to all the provisions—a meeting of the minds—in order that a contract may be created.

It has not been shown in the instant case that the respondents had encumbered the property to any extent, or at all. Presumably they had not, as, in case of the exercise by appellant of his right to repurchase under the option, the implied obligation of respondents to reconvey the property to appellant, free from any encumbrances on their part, would devolve upon respondents, and it would be a breach of such implied obligation, and would also be inequitable, if respondents had, by anticipation, rendered themselves unable to fulfill such obligation; and, until the contrary appears, it is presumed that a person has not placed himself in a position which would render him unable to perform his contractual obligations. We are not called upon to decide what might have been the possible effect as to appellant's rights under the option, as to, possibly, extending the time of payment, and, perhaps, affecting other phases of the transaction, if it appeared that respondents had encumbered the property, for the reason that no such facts are before us.

Where, by virtue of an option agreement, an

optionor agrees to sell property under the terms and conditions specified in the agreement, and the optionee is to indicate his acceptance by the act of payment of all or part of the purchase price, upon a day or within a period of time stated, the first payment, at least, must be made when due. Time is, necessarily, because of the nature of such a contract, of the essence thereof, whether expressly so stated therein or not.

The attorneys for appellant have contended that because time is not expressly stated in the option to be of the essence of the contract, equity, to avoid the forfeiture of the rights of the optionee under the agreement, should relieve him (appellant), and provide for the specific performance of the agreement by respondents. They have cited certain cases, not in point, because they are cases not involving rights under a mere option contract. Appellant has also cited sections 26, 27, and 28, on pages 457–459 of 23 Cal. Jur., indicating that time, unless expressly stated in the contract to be of the essence, is, in certain kinds of contracts and under certain circumstances, held not to be of the essence. These sections relate to agreements of purchase and sale, wherein, in the first instance the vendee becomes obligated to pay, and do not relate to mere option contracts in which the optionee in the first instance is not obligated at all. Other cases cited by appellant disclose the allowance of additional time to pay money, where the payor is exercising the right of redemption. These authorities are inapplicable to the situation in this case.

In support of the proposition that time is of the essence, and is a condition precedent, where the exercise of the optionee's right under an option to purchase land is to be the payment of money, we cite the following cases which we have found to be in point and applicable to the situation existing in the instant case: Trogden v. Williams, 144 N. C. 192, 56 S. E. 865, 10 L. R. A., N. S., 867; Curtis v. Blair, 26 Miss. 309, 59 Am. Dec. 257; Hunt v. Bassett, 269 Mass. 298, 168 N. E. 783

(cited by respondents); Northern Illinois Coal Corporation v. Cryder, 361 Ill. 274, 197 N. E. 750, 101 A. L. R. 1420; 12 Am. Jur. sec. 312, p. 867; 30 C. J. S., Equity, sec. 56, pp. 394–396.

■ The appellant, on June 6, 1942, when the respondents tendered their quitclaim deed, not only failed to pay or tender the money required for the payment of the first installment of the purchase price, but was not in a position to do so. He was neither ready, able nor willing to make the payment on June 5, 1942, as provided by the agreement, nor on June 6, 1942, the date upon which respondents tendered the deed, and such payment at said time was, by the terms of the agreement, a condition precedent to his right to repurchase the land. The money, as has been pointed out hereinabove, was deposited by Salisbury, on behalf of himself and Gregg, subject to numerous conditions outlined in the escrow instructions signed by McCall, which had to be complied with before any money could be paid to the respondents, and which would, necessarily, require such time to fulfill that McCall, who acquiesced in them by signing such instructions, well knew, made compliance with the agreement impossible, within the time therein fixed.

■ One of the conditions, as before stated, required a title search, not only to determine whether, during the year of the ownership of the property by respondents, there had been any encumbrances placed upon the property, but to determine, also, the condition of the title generally. This title search, apparently, had not been actually commenced June 5, when the money became due, but had merely been authorized. It appears, from the evidence, that the Title Guarantee & Trust Company had communicated with the Pioneer Title Insurance & Trust Company and learned that a man would have to be sent to Tonopah to do the work, and it would require two hundred dollars. Apparently McCall guaranteed to the Title Guarantee & Trust Company the payment of the escrow charges, and the testimony of Mr. Booth, vice

president of Title Insurance & Trust Company, is rather vague as to why the title search was not proceeded with promptly. The inference is that it remained in abeyance awaiting the payment of the two hundred dollars. This general title search was apparently made necessary by the requirements of the transaction between McCall and the third parties, and not by any reasonable requirement of the transaction between McCall and the Carlsons. But it involved indefinite delay in respondents' receiving their money, and they had agreed to no such delay; neither had they agreed that the time of payment was, in any manner, conditional upon a title search.

The appellant commenced the instant case July 18, 1942, about six weeks after the money became due, on June 5, 1942, offering to pay sufficient money into court to comply with the terms of the contract, and, virtually, praying for specific performance. The case did not come to trial until April 9, 1945. The court's decision was filed May 16, 1945.

Thus, if the trial court had done what appellant endeavored to have that court do, it would, if all other conditions had been complied with, have been required to compel the respondents to accept the purchase money almost three years after appellant had defaulted. This the trial court, properly, declined to do.

Other conditions, also, were involved. The escrow instructions required not only good title in the Carlsons before the money so deposited could be "used," but, also, required a policy of title insurance showing the title to the property vested in T. A. McCall, a married man, subject to taxes, covenants, conditions, restrictions, reservations, easements, right of way of record, all of which were subject to McCall's approval, and such additional encumbrances as he might approve, and a trust deed to be filed for record, securing a note for $4,048.17. It seems most extraordinary that it was even proposed in the escrow instructions that respondents, before actually being paid the purchase money, would have to

deliver the deed and permit it to be recorded, so that title would be vested in appellant, in order that the required policy of title insurance might issue, and then depend for payment upon McCall (and doubtless the third parties) being satisfied with the terms, reservations, conditions, etc., of the policy, and dependent, further, upon McCall executing the trust deed to the third parties. If McCall had not been satisfied with such conditions, reservations, etc., and had decided not to approve them, or not to execute the trust deed, there was no provision for reconveyance to the Carlsons.

Suffice it to say that the Carlsons had agreed to no such conditions, and the presentation to O. H. Carlson of escrow instructions containing such conditions and providing for payment at some uncertain and indefinite time in the future, provided all of the conditions were satisfied, constituted no valid tender to respondents of the first installment of the purchase money, nor of any money. It was not an acceptance of the offer of respondents embodied in the option agreement, but amounted to its rejection, and, at most, constituted a new offer or proposal by appellant, which the respondents had the right to, and did, decline.

The California case of Bourdieu v. Baker, 6 Cal. App. 2d 150, 44 P. 2d 587, cited by respondents, is in point upon the proposition involved in the question we are now considering. We quote from 44 P. 2d at page 591, as follows:

"The deposit of this money with the bank as agent of the depositors, to be paid to the plaintiff only on unauthorized conditions, did not comply with the terms of the option agreement and is not a sufficient tender or offer of performance, Segno v. Segno, 175 Cal. 743, 167 P. 285; Righetti v. Righetti, 5 Cal. App. 249, 90 P. 50."

Other cases which we have found of assistance are: Lambert v. Gerner, 142 Cal. 399, 76 P. 53; Four Oil Co. v. United Oil Producers et al., 145 Cal. 623, 79 P. 366, 68 L. R. A. 226; 17 C. J. S., Contracts, sec. 43, p. 381;

McCone v. Eccles, 42 Nev. 451, particularly page 457, 181 P. 134.

■ The trial court's decision was well reasoned and was amply supported by substantial evidence; in fact, the same, and that court's findings and conclusions, have our entire approval. It is clear that neither the trial court nor this court has any right or authority to create a new contract such as contended for by the appellant, which the parties themselves have not made, nor any right or authority to attempt to enforce, or require performance of, any contract between the appellant and respondents in the instant case, containing or involving terms and conditions substantially different from the terms and conditions of the lease and option agreement made and executed between the parties on June 9, 1941. It is also clear that said option agreement and all rights of the appellant thereunder ceased and were terminated prior to the commencement of this action in the district court, by reason of the failure of the appellant to comply, substantially or at all, with its terms and conditions, and, particularly, because of the failure of the appellant to pay to respondents, within the time specified in the agreement, the first installment of the purchase price of said property.

■■ Our equitable powers do not extend so far as to permit us to disregard fundamental principles of the law of contracts, or arbitrarily to force upon parties contractual obligations, terms, or conditions which they have not voluntarily assumed. In this regard, equity respects and upholds the fundamental right of the individual to complete freedom to contract or decline to do so, as he conceives to be for his best interests, so long as his contract is not illegal or against public policy. In this respect, and many others, equity follows the law. Much as we would like to relieve the appellant from his unfortunate situation, we cannot rightfully do so, as we must maintain the necessary certainty, stability and integrity of contractual rights and obligations.

We believe it is proper for us to observe that if appellant had sought, at a time sufficiently early to be effective, competent and disinterested legal advice and guidance, in connection with his transactions with respondents, he would, most likely, have been able to avoid such loss as has probably become inevitable by reason of his failure to appreciate fully the meaning, scope and limitations of his rights, and those of the respondents, in connection with said transactions, and to act accordingly.

For the reasons indicated, the judgment of the district court, and that court's order denying appellant's motion for a new trial, are hereby affirmed.

TABER, C. J., concurs.

DUCKER, J., died August 14, 1946. Successor not yet appointed.

## ON PETITION FOR REHEARING

September 24, 1946.

By the Court, HORSEY, J.:

The petition for rehearing in the above-entitled cause is hereby denied.

TABER, C. J., concurs.

EATHER, J., did not participate.