## THE GUILFORD-CHESTER WATER COMPANY *vs.* THE TOWN OF GUILFORD.

Third Judicial District, New Haven, January Term, 1928.

WHEELER, C. J., MALTBIE, HAINES, HINMAN and BANKS, Js.

In determining whether a transaction is a conditional sale or a mortgage, the controlling question is the intention of the parties as to the purpose to be effectuated. If the transfer is intended merely to secure an existing indebtedness, it is a mortgage; but if the debt is extinguished or if the money is not advanced by way of a loan, and the grantor merely has the privilege of refunding if he pleases, thereby entitling himself to a reconveyance, the transaction is a conditional sale.

The mere fact that there is an agreement to resell the property to the seller at a fixed price or that he has an option to repurchase does not, of itself, establish that the transaction is a mortgage, especially where there is no debt secured and no obligation to repay.

Among the circumstances to be considered in ascertaining the intention of the parties are whether there has been a change of possession; whether there is a great disparity between the value of the property and the price; whether the sale is accompanied by a defeasance; whether there is a provision for redemption or an agreement for a reconveyance; whether a borrowing or lending accompanies the execution of the instrument or is contemplated thereby or at the time; and, most significant of all, whether there is a continuation of indebtedness on the part of the seller.

If, under the contract, there is not a mutuality of the remedies of the parties—that is, if the seller's right to a reconveyance upon payment is not accompanied by a reciprocal right on the part of the buyer to compel payment—the transaction is a conditional sale; if such mutuality is present, it is a mortgage.

A debt is that which one is bound to pay to another or to perform for his benefit; that of which payment may be exacted.

This court has never held a conveyance, absolute on its face, to be a mortgage, unless there has been a defeasance either in writing or by parol agreement.

In 1925, acting under an amendment to its charter, the Sachem's Head Property Owners Association, located in the town of Guilford and incorporated for the purpose of promoting "the health, comfort, protection and convenience of persons living

therein," entered into a contract with the plaintiff water company whereby it was agreed, in part, that the company should install mains and pipes for the distribution of water within and beyond the territorial limits of the association; that the association should pay one half the cost of such installation, not exceeding $45,000; that the company should rebate to the association any excess of annual gross revenue beyond eighteen per cent of the net cost of its investment; that all the mains and pipes should be the property of the association but should be leased, rent-free, to the company for a term of ninety-nine years provided, however, that if the sum of the annual payments made by the company out of its gross revenue under the rebate provision and any other payments made at its election by the company should exceed the sum or sums contributed by the association and its members toward the construction of the water system, the association should reconvey all its interest in the system to the company and the lease should then terminate. After the mains and pipes were laid by the company in accordance with the contract and its proportion of the cost was paid by the association, the board of assessors of the town of Guilford added them to the tax list of the company and from the refusal of the board of relief to disturb the action of the assessors, the company appealed. *Held:*

1. That the mains and pipes were personal property.
2. That the contract, construed in the light of the surrounding circumstances, was one of sale with a lease to, and right of repurchase in, the vendor, and was not a mortgage.
3. That the mains and pipes were owned by the association and were, therefore, not taxable by the town against the company.
4. That the question whether they were taxable against the association could not be determined in the present action because it was not a party thereto.

Argued January 26th—decided May 4th, 1928.

APPEAL by the plaintiff from a decision of the board of relief of the town of Guilford, refusing to reduce the assessment against the plaintiff upon the tax list of 1926, taken to the Superior Court in New Haven County and reserved by the court (*Wolfe, J.*), upon an agreed statement of facts, for the advice of this court.

The agreed facts, so far as deemed essential to be here stated, may be summarized as follows:

The appellant, The Guilford-Chester Water Company, hereinafter referred to as the company, is a privately owned water company and supplies water to the following towns and their inhabitants: Guilford, Madison, Clinton, Westbrook, Old Saybrook, Essex, Saybrook and Chester. For many years it has maintained water mains in the town of Guilford and has been legally assessed and paid taxes thereon to the town of Guilford, pursuant to §1182 of the General Statutes, but prior to 1925 these mains extended no further toward Sachem's Head than a point known as Jones Bridge.

The Sachem's Head Property Owners Association was incorporated by Special Act in 1921. Special Laws of 1921, p. 866 *et seq.* Its objects were stated to be to provide for the improvement of the lands in the described territory, "and for the health, comfort, protection and convenience of persons living therein." Power was vested in an executive board, therein provided for, to make by-laws, regulations and ordinances to accomplish these objects, control of sidewalks, crosswalks and footpaths in the streets, the establishment of building lines, administration of health measures, the appointment of police officers, and other municipal functions, together with power annually to assess, lay and collect a tax on all real estate in the district. The association was also given power to take, by eminent domain, property required for fire protection, sewers, or sewage disposal plants, and to issue bonds as specified in the Act.

In 1925 and prior thereto there was no water supply within the territorial limits of the association and the nearest, most available and only source of supply was a connection with the main of the company at Jones Bridge. In that year an amendment of the association's charter was passed, providing that "for

the purpose of supplying the residents of said district with water for domestic uses and fire protection, said association may contract with any person or corporation authorized to supply water to the district, for the construction of a system of water works or the extension of any existing system, said association to bear a proportion of the cost of such construction or extension not exceeding fifty per centum, to own the system in said district jointly with the person, persons or corporation, by whom it shall be constructed or extended, and to have the option to purchase the interest of the other party in the system thus constructed at any time at a price not exceeding the cost of such construction or extension." Special Laws of 1925, p. 980.

A limitation, in the original Act, of the amount of liability which the executive board might incur, in any year, and the tax which might be laid, to not exceeding six mills on the dollar of the total value of the real estate as shown by the assessment list, was also increased to ten mills; and it was further provided that nothing contained in the section so limiting incurrence of liability shall prevent the executive board "from assuming obligations for providing a water supply for said district, when the construction of a system for said water supply shall have been authorized by vote of said association and the cost of construction of said water system to said association, in excess of the amount which may be provided by taxation hereunder and by the issuance of bonds as permitted in section one of said act, is guaranteed to said association by the members thereof, jointly and severally."

On October 3d, 1925, at a special meeting of the association, a resolution was passed approving the terms of a proposed contract with the company and authorizing the executive board to execute the same, and a further resolution was adopted providing for the

issuance of bonds to the amount of $17,000, "for the purpose of providing funds to be used for constructing a water system to furnish a supply of water for the property owners within the district for domestic purposes and fire protection." Bonds to the amount of $17,000 were subsequently issued in accordance with this resolution and all were sold, at par, to the Guilford Trust Company. On October 15th, 1925, the contract was executed on behalf of the association and the company.

By this contract, which is set forth in the record as Exhibit B, the company agreed, in paragraph one, to install mains of specified sizes from Jones Bridge to Sachem's Head and in designated streets and roads within the territorial limits of the association, also, beyond and outside these limits, through Vineyard Road to Vineyard Point. The association agreed to pay the company $20,000 within sixty days after signing of the contract; $20,000 within sixty days after the work is completed and water turned on ready to be supplied, and such further sum, not exceeding $5,000, as shall equal one half the cost of the Uncas Point extension, it being understood and agreed that the total sum to be paid by the association, aside from the voluntary contributions made by the members of the association and the residents of Vineyard Point, shall not exceed fifty per cent of the total cost of construction.

Detailed provisions are made for the annual rates to be paid the company by the association, the members thereof, and residents of Vineyard Point for service through these mains and extensions thereof, and the association is not required to collect and is not made responsible for any charges for water except that furnished to it for fire protection and other association purposes. The company assumes supervision

and control of the construction, maintenance and operation of the system and all liability, expense and damage arising therefrom, and agrees to make extensions of the system, provided a reasonable guaranty is given that the gross revenue from such extensions will equal fifteen per cent on the net cost, to the company, of construction. It is further provided, however, that no extension of the system shall be made within or without the district of the association or Vineyard Point, except upon such terms and conditions as the executive board shall decide are equitable and just, based on the terms and conditions of this agreement, and having especially in mind the money paid or to be paid to the company, toward the cost of the construction of the system under the terms of this agreement, including voluntary contributions and contributions from residents of Vineyard Point.

The company agrees to pay all taxes, if any, assessed on this water system or any extensions thereof.

It is further agreed, in paragraph eight, that if and when, by reason of the number of consumers connected with said mains and any extensions made therefrom, the annual gross revenue of the company shall exceed eighteen per cent on its net cost for mains and extensions, which for the purposes of this agreement shall be considered as not exceeding $45,000 for the mains described in paragraph one, the company will pay over such excess to the association, to be applied by the association for the purposes of reducing its bonded indebtedness, extending its water system, paying for public water service or for pro rata distribution to the takers of water, in such amount or amounts for any and all of such purposes as the executive board shall determine.

Paragraph fifteen of the contract is as follows: "It is understood and agreed, in consideration of the pay-

ments by the association to the water company herein-before provided and of the covenants herein contained, that all the water mains described in paragraph 1 when installed, and all extensions thereof within the district of the association, shall be the sole and exclusive property of said association, and all right and title of the water company is hereby assigned and transferred to the association; and the association in consideration thereof and of the covenants of the water company agrees to lease and does hereby lease to the water company all of said mains and all extensions thereof within the district of the association, and the sole and exclusive use of the same, free of rent or charge for a term of ninety-nine years from and after June 1, 1926; and it is further agreed that whenever the payments to the association of the gross revenue in excess of eighteen per cent of the water company's investment, referred to in said paragraph 8, or any other payment which the water company may elect to make, aggregate the sum or sums paid by the association, including the voluntary contributions made by members of the association and the residents of Vineyard Point towards the cost of construction of said water system or any extension thereof, the association agrees thereupon to convey all its interests in said water mains, and any extensions thereof to said water company, and upon such conveyance said lease shall terminate; but this agreement, in all other respects, shall continue during the balance of said term of ninety-nine years, and such excess of gross revenue shall, after the conveyance of the interest of the association in said water system to said water company be paid during the continuance of this agreement pro rata to the takers of water, until the regular rates in the Guilford Division shall become operative in place of said special rates."

Between October 15th, 1925, and June 1st, 1926, the company caused the mains specified in the contract to be constructed and installed, at a cost of approximately $66,000 for mains outside the territorial limits of the association and approximately $36,000 for mains within those limits, and, in accordance with the contract, the association paid the company $47,829.42.

In October, 1926, the company lodged, with the assessors of the town of Guilford, its tax list, including therein, under the description "Old Line, $16,000," its water mains, in the town, above Jones Bridge. The assessors, however, added to this list the mains constructed under the agreement with the association and assessed them at $25,000. The company appealed to the board of relief, which board refused to erase or reduce the item so added or grant any relief in the premises, and the company then appealed to the Superior Court.

*J. Birney Tuttle,* for the plaintiff.

*Robert C. Stoddard,* for the defendant.

HINMAN, J. The questions upon which advice is desired are, briefly stated, as follows: Is the contract, Exhibit B, a mortgage? Are the water mains installed in accordance with this contract, or any of them, taxable by the town of Guilford? If not all, but a part, which:—all of the mains outside the territorial limits of the association; those from Jones Bridge to the association limits; and those, beyond these limits, to Vineyard Point? Is the appellant company aggrieved by the action of the board of relief? We discuss these in order.

The appellant company claims that, under the contract, Exhibit B, all the mains described therein and installed in conformity thereto are sold and transferred

to, and are the property of, the association, and leased by it to the company with privilege of purchase by the latter, all as provided in paragraph fifteen, quoted above. The contention of the defendant town is that the contract, when considered in its entirety, does not amount to a sale, conditional or absolute, but is, in effect, a mortgage given by the company to the association to secure the amount paid by the latter toward the cost of the mains, and that the company still owns the mains and a tax thereon was properly assessed against it.

These water mains are personal property. *Norwalk* v. *New Canaan*, 85 Conn. 119, 126, 81 Atl. 1027; *Field* v. *Guilford Water Co.*, 79 Conn. 70, 72, 63 Atl. 723. The distinction between a sale of personal as well as real property and a mortgage of such property is that the former is a transfer of the absolute title therein for a price, whereas a mortgage is at most a conveyance of property as security for the payment of a debt or the performance of some other obligation, subject to the condition that on performance title shall revest in the mortgagor. The controlling consideration in determining whether a transaction is a sale or a mortgage is the intention of the parties, ascertained in view of all the circumstances, as to the purpose which the transaction is to effectuate. If it resolves itself into security for a debt or other obligation, it will be held to be a mortgage, otherwise, a sale. Among the facts to be considered in ascertaining such intention are whether there has been a change of possession; whether there is a great disparity between the value of the property and the price; whether the sale is accompanied by a defeasance; whether there is a provision for redemption or an agreement for a reconveyance; whether a borrowing or lending accompanies the execution of the instrument or is contemplated thereby or at the time;

and, most significant of all, whether there is a continuation of indebtedness on the part of the seller. The absence of personal obligation on the part of the vendor shows that the transaction was not a mortgage.

The general test to be applied is: If the transfer is intended merely to secure an existing indebtedness it is a mortgage; but if the debt is extinguished, or if the money advanced is not by way of a loan, and the grantor merely has the privilege of refunding if he pleases and thereby entitling himself to a reconveyance, the transaction is a conditional sale. The fact that there is an agreement to resell the property to the seller at a fixed price or that he has an option to repurchase it does not, of itself, establish that the transaction is a mortgage, especially where there is no debt secured and no obligation to repay. *Williams* v. *Chadwick,* 74 Conn. 252, 255, 50 Atl. 720; *Anderson* v. *Colwell,* 93 Conn. 61, 65, 104 Atl. 242; *Fosdick* v. *Roberson,* 91 Conn. 571, 575, 100 Atl. 1059; *French* v. *Burns,* 35 Conn. 359; *Jarvis* v. *Woodruff,* 22 Conn. 548, 550; 11 Corpus Juris, "Chattel Mortgages," §96 *et seq.;* 1 Jones on Mortgages (7th Ed.) §§258 to 265; L. R. A. 1916B, p. 132, note; 19 R. C. L., "Mortgages," §34 *et seq.*

The foregoing principles are generally recognized and adopted. The difficulty is in their application to individual cases, each of which must be decided in view of the peculiar circumstances which pertain to it and mark its character, since the criterion, the intention of the parties, is to be ascertained by considering their situation and surrounding facts, as well as the written memorials of the transaction. 1 Jones on Mortgages (7th Ed.) §258. We therefore proceed to apply the above-mentioned tests to the facts in the present case.

Our first inquiry is whether there exists a debt as

between the parties to the contract in question. A debt is "that which one . . . is bound to pay to another or to perform for his benefit; that of which payment is liable to be exacted." *Cook* v. *Bartholomew*, 60 Conn. 24, 26, 22 Atl. 444; 1 Bouvier's Law Dictionary (3d Rev.) 786. It contemplates not only an obligation upon the debtor to pay, but a reciprocal right on the part of the creditor to enforce payment by appropriate proceedings. 1 Jones on Mortgages (7th Ed.) §265.

In determining, as we are here called upon to do, whether a contract is a mortgage or a sale with right of repurchase, a test generally accepted as decisive is "the mutuality and reciprocity of the remedies of the parties—that is to say, if the grantee enjoys a right, reciprocal to that of the grantor to demand a reconveyance, . . . to compel the latter to pay the consideration named in the stipulation for reconveyance, the transaction is a mortgage; while if he has no such right to compel payment, the transaction is a conditional sale. This test is a derivation of the consideration that personal liability . . . is regarded either as the *sine qua non* of a mortgage or as a factor whose existence or nonexistence points strongly to the fact that a conveyance is or is not a mortgage." 19 R. C. L. p. 266.

Here, while under paragraph fifteen of the contract, the company, the vendor, has the right if it so elects to repay to the association the amount paid by the latter toward the construction of the mains and extensions and thereupon and thereby obtain a reconveyance of such mains and extensions, we fail to discover any right in the association, the vendee, to require and obtain such payment, at any time or in any manner. The only pecuniary obligation enforcible by the association is that contained in paragraph eight, concerning annual payments of gross revenue in excess of

eighteen per cent on the net cost to the company for the mains and extensions, and it cannot reasonably be claimed that the purpose of paragraph fifteen is to secure these payments, as such. In this respect, then, the contract exhibits the characteristics of a sale rather than a mortgage. Neither do we find in the contract or the circumstances any indication that the payments made by the association toward the cost of the system were intended as in the nature of a loan; this would be so conspicuously *ultra vires* of its charter powers that the fact that bonds for these payments were issued and sold would seem to be a sufficient refutation of any suggestion to that effect.

"It will be found, also, that in all cases in which this court has held a conveyance absolute on its face to be in fact a mortgage, there has been a defeasance either in writing or by parol agreement." *Fosdick* v. *Roberson, supra,* p. 575. We find no express or implied provision that this conveyance shall be void upon performance of any specified condition, or other contradiction of the plain implication of the language used that an agreement for repurchase and reconveyance is intended rather than anything in the nature of a right of redemption residing in the water company.

The company expended about $102,000 to provide and install the mains in question. The cash consideration presently moving from the association to the company was slightly less than half that sum; however, that was far from the sole benefit accruing to the company. The extension obviously afforded a very considerable increase of business, at specified rates which the contract discloses to be extremely favorable to the company, a monopoly of all revenue up to eighteen per cent of the net cost, to it, of the system, a ninety-nine year lease free of rent or charge, a right of repurchase for the amount contributed by the association,

without interest, and other desirable incidental advantages. All in all, there is surely not such a disparity between the value conveyed and the consideration as, at most, should over-balance all the other weighty considerations pointing to an opposite conclusion.

We conclude, therefore, that the contract, Exhibit B, was intended by the parties to be, and is, an instrument effecting a sale with a lease to and right of repurchase in the vendor, and not a mortgage.

This conveyance is to be construed as covering, in terms, all the pipes mentioned and described in paragraph one of the contract, including those located outside the corporate limits of the association, and such additional and future extensions of the system, beyond the pipe line so described, only, as are or may be located within the corporate limits. It follows, then, that the ownership of the mains the taxability of which is now in question is in the association and that they are taxable, if at all, against it as such owner. This question we do not determine, since the association is not a party to this proceeding.

We advise, therefore, in answer to the questions propounded, that (1) Exhibit B is not a mortgage; (2, 3, 4 and 5) the water mains installed in accordance with the contract, Exhibit B, within the territorial limits of the association, and between these limits and Jones Bridge are not taxable by the town of Guilford against the appellant; (6) those so installed between the limits of the association and Vineyard Point are not taxable by the town of Guilford against the appellant; (7) the appellant company is aggrieved, to the extent indicated by the foregoing answers, by the action of the Board of Relief.

No costs will be taxed in this court in favor of or against either party.

In this opinion the other judges concurred.