W. SCOTT ROBINSON, APPELLANT, v. WES DURSTON AND THUNDERBIRD FIELD, INC., A NEVADA CORPORATION, RESPONDENTS.

No. 5044

September 25, 1967                    432 P.2d 75

*Jones and Holt,* of Las Vegas, for Appellant.

*Harry E. Claiborne,* of Las Vegas, for Respondents.

## OPINION

By the Court, GABRIELLI, D. J.:

This appeal is from judgment of trial court in favor of respondents (plaintiffs below) Wes Durston and Thunderbird Field, Inc., a Nevada corporation (hereinafter, unless otherwise indicated, the Court will use the name Durston to refer to both plaintiffs—since it was an exclusively Durston owned corporation—and he was not personally a party in interest but acted only for the corporate plaintiff) and against appellant (defendant below) W. Scott Robinson.

Durston commenced this action to have a grant deed absolute on its face, executed and delivered simultaneously with an option to repurchase declared to be a mortgage as security for a loan.

After trial, the Court held the transaction to be a loan with grant deed duly executed to secure same and Durston was ordered to pay Robinson 7 percent interest per annum on the actual sums, i.e., $95,000 ($70,000 December 29, 1961—$25,000 April 3, 1962), used from date they were made available to plaintiff until actual date paid and further ordered the 15.45 acres of unimproved land here involved returned to plaintiff.

Appellant assigns error in that the findings and judgment of the trial court are contrary to and unsupported by the law and evidence, and for its refusal to strike certain findings and to grant ones requested by appellant.

The question presented is whether the transaction was a loan and security or an absolute sale with option to repurchase. The applicable principles of law are not greatly in dispute. A deed absolute on its face may be shown to be a mortgage in equity and particularly so where the claim of usury is made or indicated. In such cases the form of the transaction will be disregarded and its substance and the intention of the parties at the time will control. The only question we need consider is: Did the parties intend that the transaction should be a mortgage? Either party has the right to testify as to what that

intention was—weight is for trier of fact. Pomeroy's Equity Jurisprudence, Vol. 4, §§ 1192–1196 (5th ed. 1941); Annotations 79 A.L.R. 937; 155 A.L.R. 1104; 111 A.L.R. 448; and cases hereinafter cited. For convenience and clarity, Pomeroy's classic statement of the equitable principles here involved is quoted from his Section 1193:

"In general, all persons able to contract are permitted to determine and control their own legal relations by any agreements which are not illegal, or opposed to good morals or to public policy; but the mortgage forms a marked exception to this principle. The doctrine has been firmly established from an early day that when the character of a mortgage has attached at the commencement of the transaction, so that the instrument, whatever be its form, is regarded in equity as a mortgage, that character of mortgage must and will always continue. If the instrument is in its essence a mortgage, the parties cannot by any stipulations, however express and positive, render it anything but a mortgage, or deprive it of the essential attributes belonging to a mortgage in equity. The debtor or mortgagor cannot, in the inception of the instrument, as a part of or collateral to its execution, in any manner deprive himself of his equitable right to come in after a default in paying the money at the stipulated time, and to pay the debt and interest, and thereby to redeem the land from the lien and encumbrance of the mortgage; the equitable right of redemption, after a default is preserved, remains in full force, and will be protected and enforced by a court of equity, no matter what stipulations the parties may have made in the original transaction purporting to cut off this right.

"This doctrine is based upon the relative situation of the debtor and the creditor; it recognizes the fact that the creditor necessarily has a power over his debtor which may be exercised inequitably; that the debtor is liable to yield to the exertion of such power; and it protects the debtor absolutely from the consequences of his inferiority, and of his own acts done through infirmity of will. The doctrine is universal in its application, and underlies many special rules of equity. * * *"

This Court recently, in Kline v. Robinson, 83 Nev. 244, 428 P.2d 190 (1967) (incidentally the same Mr. Robinson here involved in a similar type transaction), stated in connection with the factual situation there presented:

"The trial judge in concluding there was no disputed factual issues to be presented to the jury, ruled that the evidence clearly and convincingly disclosed a sale with right of repurchase, and not a loan. Hence there was no question of usury.

In light of the evidence reviewed above, he was not entitled to withdraw from the jury's consideration the nature of the transaction, as either a loan or a sale. The distinction between a sale and a loan has been succinctly defined in Milana v. Credit Discount Co., 163 P.2d 869 (Cal. 1945);

" 'A sale is a transfer of the property in a thing for a price in money. The transfer of the property in the thing sold for a price is the essence of the transaction. The transfer is that of the general or absolute interest in property as distinguished from a special property interest. A loan, on the other hand, is the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use; and if such be the intent of the parties the transaction will be deemed a loan regardless of its form.

[Citations.]

" 'In a sale the delivery of the absolute property in a thing and the receipt of a price therefor consummate the transaction. In a loan the initial transaction creates a debit and credit relationship which is not terminated until replacement of the sum borrowed with agreed interest.' Whether a transaction in the form of a sale with option to repurchase is in fact a sale, or a loan disguised as a sale to cover up a scheme to collect usurious interest is an issue for the jury. Cannon v. Seattle Title Trust Co., 252 P. 699 (Wash. 1927); Rosemead Co. v. Shipley Company, 278 P. 1038 (Cal. 1929); Britz v. Kinsvater, 351 P.2d 986 (Ariz. 1960); Kawauchi v. Tabata, 413 P.2d 221 (Hawaii 1966).

"There is a wealth of evidence in this case from which a jury might find there was a loan rather than a sale, especially when instructed they can disregard form and look to the substance of the transaction and intent of the parties. Fiedler v. Darrin, 50 N.Y. 437 (1872), Annot., 154 A.L.R. 1065."

The burden of proof is upon the one asserting it was a loan and he must establish that fact by evidence which is cogent, clear, and convincing and leaves no doubt upon the mind. Bingham v. Thompson, 4 Nev. 224 (1868); Pierce v. Traver, 13 Nev. 526 (1878). Durston is entitled to have it enforced as a mortgage if he can carry his burden of proof. It is not our function to weigh the testimony, but only to determine whether there is sufficient evidence to support the trial court's findings and judgment. This Court stated in McCall v. Carlson, 63 Nev. 390, 413, 172 P.2d 171 (1946), "Having the witnesses before him, and the opportunity of observing their demeanor

and manner of giving their testimony, he was in a better position than we are to evaluate such testimony and determine its proper weight. There being a conflict in the evidence as to the question of adequacy or inadequacy of consideration, we shall follow the well established rule and not disturb the findings in that respect, of the trial court, there being substantial evidence to support them." Citing cases. The facts and circumstances of each case are always carefully examined.

We have concluded, giving due deference to the findings of the learned trial court, upon the facts presented as to the intention and purpose of the parties at that time (December 29, 1961) that there is substantial evidence to support the conclusion and judgment reached.

The facts fairly and substantially established by this record are as follows:

That prior to December 29, 1961, Durston and Robinson were personal friends and at the time were members of Board of Trustees of the First Methodist Church in Las Vegas. Prior to May, 1961, Durston had acquired an option to purchase from one Hickson approximately 61 acres of unimproved land (the 15.45 acres here involved being a portion thereof) fronting on Highway 95, approximately four and one-half miles northwest of Las Vegas in the vicinity of what was then the Thunderbird Airport owned and operated by Durston. The purchase price was $1,000 per acre, option was to expire on January 1, 1962. Durston opened an escrow for the purpose of exercising his option but was "in dire need of money" (Robinson's words) at the time he was seeking a loan and at all other times material hereto. He was compelled to obtain extensions of time on the option from Hickson. Some time before the close of this escrow on December 29, 1961, Durston had sought out his good friend Robinson who was interested in investing money privately, resulting in Robinson's $70,000 deposit in escrow on December 29, 1961, two days before expiration date. The escrow was then closed with deeds being recorded from Hickson to Durston and Durston to Robinson and option to repurchase from Robinson to Durston for $85,-000 to be exercised not sooner than July 15, 1962, or later than January 1, 1963. Seventy-seven dollars in Internal Revenue Stamps were affixed. Attached to the deed was the necessary corporate certificate authorizing the "conveyance" to Robinson. Of the $70,000 put in escrow by Robinson, $8,189.48 went to Durston—the balance was used to pay Hickson for the land and for expenses of escrow. It was at Robinson's insistence that the transaction take the form of

absolute sale with option to repurchase so that he could take advantage of long-term capital tax under Federal tax law and that was the reason why repurchase could not occur before six months had elapsed. Robinson denied this but Durston and Merle Adams of Nevada Title and Insurance Company of Las Vegas who handled the transaction so testified. The record is silent as to what efforts Durston made to obtain loan elsewhere —but this is not of any significance here. Neither party had legal counsel at this time, the entire transaction being handled by the aforesaid Merle Adams. Adams, the single disinterested witness who testified in this case stated that the reason Robinson wanted to take a deed and give option back was to avoid payment of taxes on interest bearing notes. Durston remained in full and complete possession, control, and management of all the lands at the airfield including the 61 acre tract. No lease of any kind or nature was executed, intended, or contemplated between parties (Robinson to Durston) and no rental paid. Durston continued active in managing the property, in improving it, and making plans for further construction as hereinafter set forth. After December 29, 1961, the friendly relation and discussions continued, culminating in a meeting in Defendant's counsel Robert E. Jones' office on or about April 2, 1962, wherein an additional overall construction loan was discussed totaling in all $168,000 or $178,000 (some dispute on amount [which will be explained hereinafter] which in either event included the original $70,000 already advanced) and an understanding sufficient for said attorney to prepare and carefully draft an extensive document defining the conditions for the additional loan. According to Durston the entire package was to be consummated at one time. However, on April 3, 1962, the day after the attorney's office meeting, said attorney had prepared only a new partial agreement (which, according to Durston's testimony, was to be part and parcel of an overall loan commitment) of said date whereby Durston released his December 29, 1961 option to repurchase in consideration of $25,000 (of which he was in dire need for the express purpose of asphalting the runways of his airport) in hand paid to him, and at the same time and place Durston secured second option to repurchase the 61 acres less 15.45 acres. The second option could not be exercised prior to August 1, 1962 and not later than July 5, 1963, for the total sum of $95,000—the exact amount advanced to date. The 15.45 acres according to Durston were to be Robinson's entire bonus for the overall contemplated loan of the $178,000 or $168,000. According to Robinson the 15.45 acres were released to him solely on the

$25,000 advance, maintaining this transaction was separate from prior and subsequent negotiations between the parties. This is incredible on its face. The total agreement was to have been prepared and ready at this time to cover the entire loan. Said counsel represented it would be ready in a few days awaiting specific legal descriptions of land involved in the particular contemplated improvements that were to be made by Durston. Said proposed agreement was eventually prepared on or about April 20, 1962 (and still within the original six months option period) and given to Durston to sign. He refused to sign for reasons hereinafter set forth. It recited what had transpired before generally as related hereinabove. It further recited that since "Thunderbird desires to have constructed upon the land subject to the April 3, 1962 option, certain additional improvement and Robinson is willing to assist in financing said improvements," and went on, inter alia to provide for an additional Robinson loan for the following purposes, to-wit: (a) construction of a warehouse, the sum of $23,000; which construction at this time had already been commenced by Durston to the extent of $4,442 undisputed and for which Durston had an executed long-term lease with a special service supply company; (b) construction of a 20-unit motel the sum of $50,000 ($2,500 per unit). Robinson reserving the right to control disbursements of these funds for the purpose of making certain that said funds were expended only for the purposes intended. It was to be mutually acknowledged that the funds made available may not be sufficient to complete the improvements mentioned and that Robinson would not be required to advance any additional funds, which if any needed, were to be obtained by Durston. Durston was to have possession and authorized to lease and sublease improvements to June 30, 1963, pay all taxes and assessments against the real and personal property here involved. A third option was proposed here for a total repurchase cash price of $202,900 at any time between August 1, 1962 and July 1, 1963, and all expenses in connection therewith to be paid by Durston. As consideration for the option to repurchase, Durston was to pay, under the proposed unexecuted agreement, $2,075 per month for 12 months (totaling $24,900) which would be credited to the purchase price if option was duly exercised. It will be noted that the repurchase price recited is $34,900 or $24,900 more than he was willing to advance ($168,000 or $178,000) under the proposed unexecuted agreement. This is for 46 acres only, not the original 61 acres from which Robinson kept 15.45 acres under the aforesaid April 3, 1962 option to repurchase. It is this 15.45 acres only which is the subject of this action, the balance

having been returned to Durston by his exercise of option to repurchase on October, 1962, and payment of $95,000 from funds borrowed elsewhere. The terms of the proposed agreement are so clearly usurious as to admit of no question if intended as a loan—but not so, if it is a true sale and option to repurchase. Said proposed agreement was prepared by attorney Jones, who at the time was acting on behalf of both parties (all were mutual friends)—in fact Durston testified he always believed that Jones was his attorney until this unexecuted agreement was prepared. The proposed unexecuted agreement prepared by said counsel is significant only to the extent that it may indicate the intention of the parties at the time. Durston testified that said counsel admitted (counsel did not testify) to him that the proposed agreement was not in accordance with aforesaid oral discussions held in his office on April 2, 1962 between the parties and that the same was prepared in accordance with Robinson's strict instructions and that he would make further attempts to get it to conform to the original discussions. Durston's reasons for refusal to execute the agreement as prepared were: (a) Robinson was to advance an additional $10,000 for construction of a trailer park on the premises, thus bringing the total loan to $178,000 instead of $168,000 proposed. Incidentally, counsel in all his carefulness did not include this specific $10,000 trailer court improvement item in the loan portion of the agreement, yet in the body of the agreement (paragraph 7) he slipped as follows: "Thunderbird agrees to employ an architect at Thunderbird's expense to produce plans and specifications for the said warehouse, motel, and *trailer park* * * *." Which lends credence to Durston's contention that the agreement was not prepared in accordance with the discussion of the parties that the trailer park was to be included. (b) Agreement—called for release of approximately 17 acres instead of the approximate 15.45 acres bonus—already released by the April 2, 1962 option. (c) There was to be no interest on the moneys advanced, the 15.45 acres to be Robinson's entire reward, yet the agreement as prepared required $34,900 (or $24,900 if the trailer park is included) bonus to be paid for a one-year option period plus approximately 17 acres for a loan of $168,-000 or $178,000. (d) The recitals—stated that the December 29, 1961 option had "expired" which was not true and that Durston had persuaded Robinson "to purchase" the lands from Hickson, which Durston denies. It is interesting to note that Robinson under oath in his testimony attempted to deny knowledge that any particular understanding or any real discussion even was held in Jones' office on April 2, 1962

regarding additional loans for a warehouse, motel, and trailer park. However, his memory was subsequently refreshed and admitted they were at least discussed but claims no meeting of the minds. Although the record is clear as to Durston's objections to the proposed agreement it is silent as to Robinson's objections—the contention is made that neither party approved it, so that it is of no real value here. The valiant efforts of learned counsel to keep the transaction disguised as a bona fide sale suffered a lapse in his July 25, 1962 letter in evidence to Durston in a final effort to consummate the loan "substantially along the terms outlined in my written agreement of April 20th." He states further "with *minor changes* of little significance Mr. Robinson is still willing to grant you construction loans for your purposes, but cannot make these funds available indefinitely," and gave him until August 1, 1962 to accept. The lapse occurred as follows in said letter: "Since *it was understood* that he would assist you in financing a motel and warehouse *on your property, at his request* I drew a rather extensive document defining the conditions of these loans." Inconsistently, said counsel later in said letter states: "Regarding the warehouse *you have constructed* on Mr. Robinson's property, he feels for your own protection he should sell you this site. Therefore until close of business July 31, 1962, he offers to sell you at $3,000 per acre (not to exceed one and one-half acres) the site upon which the warehouse exists." In one breath learned counsel acknowledged "your property" to Durston and in the next breath offers to sell him one and one-half acres at $3,000 an acre. This is an indication of value of land from Robinson's lips. He places $3,000 value per acre on land he claimed he purchased less than six months earlier for about $1,000 per acre.

In summary it can be fairly stated said proposed agreement is incompatible with any idea of sale and is consistent with idea of a loan.

It is to be observed that foregoing recital of facts does not reflect any discussions between the parties of a sale (entire reliance for this being placed on the deed) nor was value of the property ever discussed between the parties. Additional evidence indicating value is in the record, however, as hereinafter set forth. The fact that words negativing a mortgage were so forcefully used in all the documents, and resolution of the corporation in each instance clearly and unequivocally emphasizing the sale aspects of the transactions and demonstrating Robinson as owner every time the occasion called for it—all

lend credence to the security theory for tax advantage purpose to Robinson. Robinson emphasizes that various documents expressly provided that there were "no verbal or unwritten agreements between the parties." Why the great care and stress —if the deed was truly a deed—all this extra was not necessary. As diligent as all tried to be here, the papers somewhere could very easily have contained the express proviso that "this transaction shall not be construed as a mortgage." That does not appear anywhere nor was it intended to appear anywhere.

Robinson strongly urges that personal liability on the part of the grantor must exist independent of the conveyance and the contract of reconveyance, before a deed can be held to be a mortgage. In support of this contention he cites in his brief a quotation from Pomeroy's Equity Jurisprudence § 1195 taken from McCall v. Carlson, 63 Nev. 390, 172 P.2d 171 (1946), regarding the requirement of the continued existence of a debt as a general criterion in determining these cases. For convenience and clarity it is quoted here.

" 'Sec. 1195. The General Criterion: The Continued Existence of a Debt—Whether any particular transaction does thus amount to a mortgage or to a sale with a contract of repurchase must, to a large extent, depend upon its own special circumstances; for the question finally turns, in all cases, upon the real intention of the parties as shown upon the face of the writings, or as disclosed by extrinsic evidence. A general criterion, however, has been established by an overwhelming consensus of authorities, which furnishes a sufficient test in the great majority of cases; and whenever the application of this test still leaves a doubt, the American courts, from obvious motives of policy, have generally leaned in favor of the mortgage. This criterion is the continued existence of a debt or liability between the parties, so that the conveyance is in reality intended as a security for the debt or indemnity against the liability. If there is an indebtedness or liability between the parties, either a debt existing prior to the conveyance, or a debt arising from a loan made at the time of the conveyance, or from any other cause, and this debt is still left subsisting, not being discharged or satisfied by the conveyance, but the grantor is regarded as still owing and bound to pay it at some future time, so that the payment stipulated for in the agreement to reconvey is in reality the payment of this existing debt, then the whole transaction amounts to a mortgage, whatever language the parties may have used, and whatever stipulations they may have inserted in the instruments. On the contrary, if

no such relation whatsoever of debtor and creditor is left subsisting, then the transaction is not a mortgage, but a mere sale and contract of repurchase.

" 'The practical test is whether there is a liability, notwithstanding or independent of the conveyance and contract of reconveyance, which the grantee can enforce against the grantor. If a loan is made to the grantor at the time of executing the conveyance, and the continued existence of his indebtedness therefor is evidenced by some collateral engagement given by the grantor, such as a note or bond, the case is simple and the transaction is clearly a mortgage. In the second place, if the conveyance is given in consideration of an antecedent debt due from the grantor, and this debt yet remains, so that the grantee may enforce his claim at some time or another against the grantor, the transaction is also a mortgage. But if this antecedent debt is wholly satisfied and extinguished by the conveyance, so that no liability remains under any circumstances against the grantor, then there is no mortgage, since there is no debt to be secured thereby. In such a case the surrender up by the grantee of the written evidences of original indebtedness, or his cancellation thereof, would be very material circumstances. Thirdly, there may be neither a present loan nor an antecedent debt, but the grantee may undertake to assume some outstanding liability of the grantor, or to pay off some claim against the grantor, so that an obligation to reimburse him would rest upon the grantor, and the conveyance may be intended to indemnify the grantee and to secure the performance of the grantor's future continuing obligation, in which case it would clearly be a mortgage.' " Id. at 410.

In this connection, Durston in his brief has referred the Court to Sec. 45, Mortgages, 33 Cal.Jur.2d at 458–459 as follows:

"To show that a deed is really a mortgage, it is ordinarily essential that there be an agreement, either express or implied, on the part of the mortgagor or someone in whose behalf he executes the mortgage, to pay the mortgagee a sum of money. A deed absolute in form may be given as security without any accompanying obligation in writing on the part of the person giving it, however, for the debt may be founded in parol. Moreover, where money is loaned to the grantor by the grantee, the law implies a promise to repay, particularly where the instrument providing for reconveyance speaks of payment of the sum at the time it becomes due and provides for credits on the indebtedness.

"The fact that there is no promise to pay is one circumstance which, with others, may rebut a presumption that either

party supposed that the deed was held as security. However, since the parties may create a mortgage to secure payment of a specified sum without personal liability on the part of the grantor, the want of a covenant to repay the money is not conclusive."

Also, a thorough analysis of this contention is made in Kawauchi v. Tabata, 413 P.2d 221 (Hawaii 1966). It was there also contended that the plaintiffs were not personally liable for a repayment of the money, that there could, therefore, be no debt, and hence no mortgage. The Hawaii Supreme Court stated:

"Defendants contend that there can be no debt—hence no mortgage—unless the plaintiff was personally liable for repayment of the money. Under this reasoning plaintiff must fail unless defendants could have obtained a personal judgment against him. Some of the writers on the subject afford qualified support for defendants' contention, while others state that the weight of authority is contrary thereto. The court below did not rule that the absence of personal liability was conclusive, but put considerable stress on the fact that: 'There is nothing before this court which indicates any right on the part of the defendants to compel the payment of any sums of money.'

"In Hess v. Paulo, supra, 38 Haw. 279, 286–287, it is stated, by quoting from Guilford-Chester Water Co. v. Town of Guilford, 107 Conn. 519, 141 A. 880, that 'a test generally accepted as decisive is the mutuality and reciprocity of the remedies of the parties; that is to say, if the grantee enjoys a right, reciprocal to that of the grantor to demand a reconveyance, to compel the latter to pay the consideration named in the stipulation for reconveyance, the transaction is a mortgage, while if he has no such right to compel payment, the transaction is a conditional sale. * * *' However, the conclusiveness of this test where personal liability is lacking was not before the court, as there was an outstanding promissory note. The quotation in the opinion continues with recognition of the fact that personal liability is not always regarded as the 'sine qua non' of a mortgage. It may be regarded simply as 'a factor whose existence or nonexistence points strongly to the fact that a conveyance is or is not a mortgage.' The source of the quotation is 19 Ruling Case Law 266, where the following appears, following the text quoted:

" '* * * Accordingly, in those jurisdictions wherein personal liability is an essential element of a mortgage, want of mutuality is, of course, conclusive that the transaction is a conditional sale. Where a contrary rule prevails, want of mutuality is strongly indicative of a sale, but is not conclusive.'

"In 36 Am.Jur., Mortgages, §§ 58–59 and § 151, which has replaced Ruling Case Law, it is stated that while the existence of an obligation to be secured is essential to a mortgage, and under some authority there must be a personal liability of the mortgagor on such obligation, under other authority 'personal liability, express or implied, is not necessarily incident to a mortgage * * *.' The latter is stated to be the general view, though the existence or nonexistence of personal liability of the grantor is strongly indicative either that the transaction was or was not a mortgage. See Annot., 17 A.L.R. 714, 717; 129 A.L.R. 1435, 1499.

[Citing cases.]

"Neither in Hess, nor in the Guilford-Chester Water Co. case there cited, was there any question of usury or of inadequacy of the price figuring in the supposed sale. Where the transaction, if it is a loan, is usurious, the personal liability of the borrower is of no real significance. Under the usury law, R.H.L. 1955, § 191–4, a suit against the borrower personally could produce only the sum advanced, without interest or profit. In this type of case the lender relies on the property for his security, being satisfied that he is protected by its high value in relation to the amount advanced. Thus in Campbell v. Dearborn, supra, 109 Mass. 130, 144, it is stated:

" 'A mortgage may exist without any debt or other personal liability of the mortgagor. If there is a large margin between the debt or sum advanced and the value of the land conveyed, that of itself is an assurance of payment stronger than any promise or bond of a necessitous borrower or debtor. * * *' "
Id. at 228–230.

Durston's and Adams' testimony was that the reason Robinson wanted to take a deed and give an option back was to avoid the payment of taxes in interest bearing note. It was against Robinson's express interest to have any formal evidence of the indebtedness. Robinson could well look to the land alone for the return of his investment for he stood to gain a great deal if the debt was not repaid and land forfeited to him. An analysis of the value of the land follows hereinafter. To the extent that the foregoing explains, expands, or enlarges upon the holding of McCall v. Carlson, supra, it is so intended on this point. In other words, the law may imply a promise to repay a debt under particular circumstances of any case, where it is clear that the lender relies on the property for his security being satisfied that he is protected by its high value in relation to amount loaned. As the Hawaii Court stated, where " '* * *

there is a large margin between the debt or sum advanced and the value of the land conveyed, that of itself is an assurance of payment stronger than any promise or bond of a necessitous borrower or debtor. * * *' "

Through the years, a number of circumstances have been so often associated with transactions which are intended to be loans of money secured by real estate mortgages, but which are effected under the guise of a sale and purchase of real estate, that they have come to be accepted as indicia of a secured loan transaction. Such circumstances which are pertinent here are:

(1) What do the documents say? (2) Who was to pay the taxes on the property? (3) Were documentary stamps affixed to the deed? (4) Was the price disproportionate? (5) Right to repurchase. (6) Absence of common formal procedures employed in real estate sales. (7) Relationship between the parties. (8) Computation of buy back rights. (9) Bonus to be paid in repurchase. (10) Financial embarrassment of the grantor. (11) Continued possession, management, and improvement of the property by the grantor. (12) Non-payment of rent.

The significance accorded these various circumstances is illustrated in the following cases:

Beeler v. Amercian Trust Co., 147 P.2d 583 (Cal. 1944); Umpqua Forest Industries v. Neenah-Oregon Land Co., 217 P.2d 219 (Ore. 1950); Kohler v. Gilbert, 339 P.2d 1102 (Ore. 1959); Phillips v. Blaser, 125 P.2d 291 (Wash. 1942); Kawauchi v. Tabata, 413 P.2d 221 (Haw. 1966); Gem-Valley Ranches, Inc. v. Small, 411 P.2d 943 (Idaho 1966); Orlando v. Berns, 316 P.2d 705 (Cal.App. 1957).

Since the ultimate matter to be determined is the intent of the parties, and since that intent must be determined from all of the facts and circumstances before the Court, there is no restriction as to the number or kind of relevant circumstances which may be considered as bearing on the issue of intent, and the opinions and texts abound with statements to the effect that ordinarily the presence or the absence of any particular circumstance is not conclusive as to the intention of the parties— all of the relevant facts and circumstances are to be considered.

Taking the circumstances in the above order, as nearly as possible, it is evident that most of the well recognized indicia of a secured loan transaction were present in the instant case.

(1) What do the documents say? Here the defendant urges that the strongest evidence of the intention of the parties is to be derived from the documents in evidence. He points to the fact that in two instances corporate resolutions were passed by the board of directors of the plaintiff corporation speaking in terms of "conveyances" and "sales." He further points to the deed of December 29, 1961, the documents signed on April 3, 1962, and the unexecuted draft dated April 20, 1962.

Now, if it were true that the documents themselves were the strongest evidence of the intention of the parties, there would be no such thing as an action to establish an equitable mortgage. See Beeler v. American Trust Co., 147 P.2d 583 (Cal. 1944), the borrower executed and delivered to the lending bank an affidavit accompanying an absolute deed to the ranch. This affidavit stated in the strongest terms that the absolute deed was an absolute deed and was not intended as a mortgage, trust conveyance or security of any kind; that possession of the property was to be delivered to the grantee; that the consideration for the deed was the cancellation of all debts, obligations, costs, and charges secured by a certain deed of trust theretofore existing on the property and the reconveyance of the property to the grantor under the deed of trust. Finally the affidavit recited that it was made for the benefit of the grantee bank and its successors and assigns, and a title company which intended to insure the property in reliance on the affidavit. Relying upon the case of People ex rel. Ford v. Irwin, 18 Cal. 117 (1861), it was argued that parol evidence could not be received to vary or dispute the terms of a written instrument explaining the purpose for the execution of a deed. This early decision in People ex rel. Ford v. Irwin antedated the California Code provision (Section 2924 Civil Code) of 1872 like our NRS 40.050, in effect, that every transfer of an interest in property, made only as a security for the performance of another is to be deemed a mortgage. The Court adverted to the decision in Vance v. Anderson, 45 P. 816 (Cal. 1896), holding it is the settled law of California that such a writing is not a conclusive criterion of the character of the transaction. To the extent that the earlier case of People ex rel. Ford v. Irwin could be said to limit the court to considering merely the documents to the exclusion of the other circumstances, it was disapproved as in conflict with the code provision. The Court said:

"If by a separate writing the parties expressly agree, at the same time an absolute deed is executed, that it is what it purports to be, that is, an absolute sale, that would be no more than what the deed itself says. Therefore, if they could thus

avoid its real effect as a mortgage, the true nature of such a transaction could never be shown, and the policy of the law never to permit a security to be converted by *any* contemporaneous agreement into a sale could be constantly evaded. [Citing code provisions and cases.] The right of a mortgagee to become the purchaser of the equity is unquestioned, but the relations of the parties are such that the transaction will be carefully scrutinized to prevent the effectuation of some device whereby the debtor under the force of necessitous circumstances is deprived of his right of redemption. * * *" 147 P.2d 583, 595. See also Phillips v. Blaser, 125 P.2d 291 (Wash. 1942), to the same effect.

(2) Who was to pay the taxes on the property?

(3) Were documentary stamps affixed to the deed?

As has been seen in the foregoing summary of evidence, the purpose of Robinson in taking a deed absolute and giving plaintiffs an option back was to enable himself to pay taxes only on the money receipted back as a capital gain, rather than pay tax on interest-bearing notes.

Having gone to this length to masque the transaction as one within the structure of capital investment for tax purposes, it is not surprising that revenue stamps were affixed to the deed by somebody. Robinson testified he paid the taxes on the property, which if so, it was for one quarter since all dealings between the parties terminated in a period of about four months.

In the case of Umpqua Forest Industries v. Neenah-Oregon Land Co., 217 P.2d 219, 235 (Ore. 1950), it is held the fact that revenue stamps were affixed on a deed absolute in form, accompanied by an option to repurchase, was a circumstance adverse to the claim that the deed was intended as a mortgage, but it was not conclusive, and as in the earlier case of Conley v. Henderson, 75 P.2d 746 (Ore. 1938), the conduct of the grantor in affixing the revenue stamps was explained by other circumstances and consequently no inference adverse to his claim was drawn.

(5) Right to repurchase. Where a deed absolute in form is accompanied by an option to repurchase, the instruments must be considered together. The option does not of itself convert the transaction into a mortgage, but it is a circumstance to be considered in favor of the existence of a mortgage. Parol evidence is admissible to connect the two writings and to show that they were parts of the same transaction, and that the whole amounted to and was intended to be a mortgage. Among other cases so holding are: Kohler v. Gilbert, 339 P.2d 1102 (Ore.

1959); Kawauchi v. Tabata, 413 P.2d 221 (Haw. 1966); Umpqua Forest Industries v. Neenah-Oregon Land Co., 217 P.2d 219 (Ore. 1950).

(6) Absence of common formal procedures employed in real estate sales. (4) Was the price disproportionate? (8) Computation of buy-back rights. (9) Bonus to be paid on repurchase.

The foregoing circumstances for inquiry are interrelated in the present case. The evidence does not show that the parties ever determined the value of the 61 acre tract by their own calculations, by formal appraisal, or otherwise, or that the value of the land was in any way a factor entering into the purported consideration for the deed or the fixing of the price for repurchase under the contemporaneous option.

Robinson charges that there is no evidence of disparity between the value of the land and the consideration. The record reveals: that, initially Durston paid the sum of $1,000 an acre for the 61 acre tract; that on the strength of the deed as security, Robinson loaned Durston $70,000; that about three or four months later, Robinson again entered into negotiations with Durston for further advances of money, actually advanced the sum of $25,000 more for paving the airport runway and agreed to advance altogether a total sum of $178,000 or at least $168,000, all on the security of the same 61 acre tract, except that in consideration of the advance of this entire sum, Robinson was to be given outright the 15.45 acre tract; that an improved tract of land across the highway from the airfield sold for $5,000 an acre; that Robinson, through his attorney of record herein, after failing and refusing to document the agreement for $178,000 did offer to advance another $73,000 for warehouse and motel on the security of the deed to the 61 acre tract; that Robinson through his attorney offered to sell Durston one and one-half acres at $3,000 per acre as aforesaid. In the first instance a sum of money was advanced which was a little more than sufficient to enable the plaintiffs to exercise their option to purchase the 61 acre tract from Hickson. The option back did not have a repurchase price in any way related to the value of the land—it was $85,000— for all that appears a simply arbitrary figure, but one representing a much higher return on a $70,000 investment than the defendant could have obtained under orthodox lending procedures, with lawful rates of interest. We think it conclusively established that there was no bargaining between the parties on the basis of value of property and throughout the entire transactions, the controlling consideration on both sides

was to allow Robinson to achieve whatever tax benefits he could derive by his investment.

There is no evidence that Robinson was in the market for the purchase of real estate, particularly real estate adjoining a commercial airport. He did not seek out the plaintiffs. Durston, having become acquainted with him in church sought him out and approached him for a loan of $70,000. In short, none of the circumstances indicate that Robinson wanted to buy land outright for its fair value. They indicate that Robinson made a loan of money and took a deed as security giving a repurchase option back.

(7) Relationship between the parties. Evidence stated is clear on this. The business, social or other relationship is a circumstance relevant to issue here. See Umpqua Forest Industries v. Neenah-Oregon Land Co., supra.

(10) Financial embarrassment of the grantor in the deed. The record is undisputed on this—reference is simply made to the recital of facts hereinabove.

(11) Continued possession, management and improvement of the property by the grantor.

(12) Nonpayment of rent. The evidence is uncontradicted on the presence of these factors as hereinabove related. It is established that continued possession of property by the grantor is some evidence that the conveyance was intended as a mortgage. See cases cited supra.

Having established that a loan was intended here, and the right to redeem being favored by courts of equity, it will not be taken away except upon strict compliance with steps necessary to divest it. Durston in effect is exercising his right to redeem the 15.45 acres here involved.

In concluding as we have, this Court is mindful of the fundamental principles of law contracts regarding arbitrarily forcing upon parties contractual obligations, terms or conditions which they have not voluntarily assumed. We deny that the necessary certainty, stability, and integrity of contractual rights and obligations and titles are in any way prejudiced by this decision under the particular factual situation established by substantial evidence.

The court wishes to make it abundantly clear that no reflection is intended, expressed or implied, regarding attorney Jones' actions as recited hereinabove (which was essential to the opinion). His competence, integrity or ability is not in any way in question. He simply became involved, as has happened

to other professional men, with friends, he being included, and endeavored to make the best of a bad situation when negotiations broke down. The intricacy and care with which the April 20, 1962 unexecuted agreement was drawn is evidence itself of the great difficulty counsel encountered in attempting to comply with the conflicting instructions and interest of his clients. If the parties had originally made a true sale, many of these problems would not have occurred. The attempt to make the transaction conform to Robinson's strict unilateral instructions is what caused the difficulty.

Judgment affirmed.

THOMPSON, C. J., and COLLINS, J., concur.