525 F.2d 995
 SWALLOW RANCCHES, INC., Plaintiff-Appellant-Cross-Appellee,
v.
Leonard BIDART and Bidart Brothers, Individually and as
co-partners dba ELTejon Cattle Company,
Defendants-Appellees-Cross-Appellants.
 Nos. 74--1423, 74--1448.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 23, 1975.
 
 Robert F. Orton (argued), of Hansen & Orton, Salt Lake City, Utah, for appellant.
 Jon R. Collins (argued), of Lionel, Sawyer, Collins & Wartman, Las Vegas, Nev., for appellee.
 OPINION
 Before CHAMBERS and KENNEDY, Circuit Judges, and ENRIGHT,* District Judge.
 KENNEDY, Circuit Judge:
 
 
 1
 Swallow Ranches, Inc. (SRI), a Nevada corporation, brought suit against El Tejon Cattle Co., a California partnership, and Leonard Bidart, as a general partner. Jurisdiction was based on diversity of citizenship. 28 U.S.C. § 1332. SRI alleged that its sale to El Tejon of four ranches, subject to an option to repurchase, was in fact a loan secured by a mortgage. SRI claimed it therefore was entitled to the protections of the Nevada usury and redemption statutes. The trial court found the transaction was a sale in both form and substance, and denied relief to SRI. SRI appeals; El Tejon cross appeals for attorney fees incurred in defending the suit below. We affirm the district court's judgment in all respects.
 
 
 2
 George Swallow was president and majority stockholder of SRI. His principal occupation was ranching, but he also had commercial expertise: he was a licensed real estate broker, and frequently prepared and signed documents without legal advice. Swallow was SRI's spokesman in negotiating the transaction leading to this suit.
 
 
 3
 Prior to 1959 Swallow and his family owned a 3,000 acre ranch near Ely, Nevada. In 1959 the Swallows obtained financing for their ranching operations by selling the property and repurchasing it under an installment land sale contract. Despite subsisting financial difficulties in the period 1960 to 1967, the family acquired three nearby ranches in an effort to assemble a large rahcn for resale at a high price. These three ranches were also financed by installment land sale contracts.
 
 
 4
 In 1966 most of these lands were deeded to third persons to hinder and delay creditors of SRI. By late 1967 SRI was unable to borrow further monies, pay sums due on the land sale contracts, or service short-term loans secured by the ranch machinery and equipment. George Swallow was unsuccessful in his efforts to sell the properties for $900,000.
 
 
 5
 The first negotiations between SRI and El Tejon occurred in the spring of 1967 and resulted in an agreement permitting El Tejon to graze its herd on the SRI property.[1] El Tejon was represented in this and subsequent transactions by its general partner, Leonard Bidart.
 
 
 6
 In the fall of 1967 Swallow offered to sell the subject properties to El Tejon, first for $1,900,000 and then for $1,400,000. Both offers were summarily rejected by Bidart. Swallow then requested a loan from El Tejon, and Bidart promptly rejected this proposal as well. Further negotiations between the parties resulted in the following transaction on December 6, 1967. SRI sold its interest in the subject properties for $550,000. El Tejon in turn gave SRI an option to repurchase the properties for $650,000 within one year or $750,000 within three years.[2] El Tejon borrowed the purchase price on the security of the subject properties and its own general credit. SRI used the proceeds to pay balances due on the purchase contracts for the various ranches, to discharge liens on the property, and to settle various other debts.
 
 
 7
 After the close of sale El Tejon occupied most of the land, although part of the properties were leased back to SRI for growing crops. After two years the lease arrangement proved unsatisfactory for both parties and was terminated. One member of the Swallow family remained on the property after the crop lease expired, first as an employee of El Tejon, and then at sufferance.
 
 
 8
 Toward the close of the option period SRI gave notice of exercise, but then withdrew the notice. The option expired. SRI commenced this litigation in October 1971, seeking reconveyance of the properties or a declaration of a constructive trust, plus actual and punitive damages. El Tejon counter claimed, asserting that Swallow and SRI had fraudulently designed the transaction to make it vulnerable to legal attack, and that the value of the properties had been misrepresented. The trial court denied all relief to SRI. It further denied El Tejon's counter claims for damages and quieted title in El Tejon.
 
 
 9
 Appellants assert the trial court erred in finding the transaction was a bona fide sale rather than a disguised loan. We find no such error. The trial court's carefully developed findings of fact are not clearly erroneous, and the court correctly followed applicable principles of Nevada law in its rulings.
 
 
 10
 It is well recognized that a sale subject to an option to repurchase is, in some circumstances, a disguised loan--a device used by lenders to avoid a seller's right of redemption or to circumvent the usury law. Robinson v. Durston, 83 Nev. 337, 339, 432 P.2d 75, 76 (1967); Merryweather v. Pendleton, 91 Ariz. 334, 340, 372 P.2d 335, 340 (1962); Burr v. Capital Reserve Corp., 71 Cal.2d 983, 990, 80 Cal.Rptr. 345, 349--50, 458 P.2d 185, 189--90 (1969); Kawauchi v. Tabata, 49 Hawaii 160, 170--72, 413 P.2d 221, 227--28 (1966); Cannon v. Seattle Title Trust Co., 142 Wash. 213, 216, 252 P. 699, 700--01 (1927). See generally 4 J. Pomeroy, A Treatise on Equity Jurisprudence § 1196 (5th ed. 1941); Annot., 154 A.L.R. 1063 (1945). And a purported sale with repurchase option may be deemed a loan secured by a mortgage even absent any evidence of debt. Robinson v. Durston, supra, 83 Nev. at 350, 432 P.2d at 83. For if there is a sale with a right of repurchase at an option price far below the property's fair market value, the inducement to repay may be as strong as under a promissory note, or more so. Campbell v. Dearborn, 109 Mass. 130, 144 (1872), cited in Robinson v. Durston, supra, 83 Nev. at 350, 432 P.2d at 83; Kjar v. Brimley, 27 Utah 2d 411, 415--16, 497 P.2d 23, 25 (1972).
 
 
 11
 But a sale accompanied by an option to repurchase is not necessarily, or even presumptively, a disguised loan. Conway's Executors & Devisees v. Alexander, 11 U.S. (7 Cranch) 218, 236--37, 3 L.Ed. 321 (1812); Bingham v. Thompson, 4 Nev. 224, 233 (1868). When a transaction is a sale on its face, the party asserting it to be in substance a loan has the burden of proving his claim by clear and convincing evidence. Robinson v. Durston,supra, 83 Nev. at 341, 432 P.2d at 77; Pierce v. Traver, 13 Nev. 526, 531 (1878); Bingham v. Thompson, supra, 4 Nev. at 233.
 
 
 12
 To resolve whether a sale is in fact a loan, Nevada law requires the trier of fact to determine the substance of the transaction and the intent of the parties. Kline v. Robinson, 83 Nev. 244, 250, 428 P.2d 190, 194 (1967); see Pease v. Taylor, 88 Nev. 287, 290, 496 P.2d 757, 759--60 (1972). The substance of the transaction is its commercial content and economic meaning. The trier of fact may look to this substance as evidence of intent; the parties may also testify on the point. See Robinson v. Durston, supra, 83 Nev. at 339--40, 432 P.2d at 76.
 
 
 13
 The evidence considered by the trial court was directed to all of these factors and the record contains ample support for its finding that this was a sale and specifically so intended by each party. It is significant that the parties negotiated for a sale from the outset. When midway in the bargaining Swallow suggested a loan, Bidart made a prompt rejection. See, e.g., Felton v. Grier, 109 Ga. 320--23, 35 S.E. 175, 176 (1900). Thus the instant case is unlike cases relied upon by appellants in which the original negotiations were for a loan and the 'buyer' sought merely a return on invested funds. See, e.g., Robinson v. Durston, supra; Kline v. Robinson, supra; Kawauchi v. Tabata, supra.
 
 
 14
 The actions of the parties after the sale are fully consistent with the conclusion that the buyer's principal motivation was to establish ownership, with substantially all its prerogatives and risks. El Tejon paid taxes and other expenses of the property, and occupied the greater portion of it. The seller-related individual who remained on the property did so for purposes consistent with El Tejon's ownership and control.
 
 
 15
 Disparity between fair market value and prices set in the contract are factors in determining whether the seller is under an economic compulsion to exercise the option to repurchase. See Merryweather v. Pendleton, supra, 91 Ariz. at 342, 372 P.2d at 340. The trial court heard extensive appraisal testimony for this purpose and found that fair market value on date of sale was between $600,000 and $700,000. It then ruled that the purchase price of $550,000 was not disproportionate to the fair market value. We cannot disagree.
 
 
 16
 Distressed financial condition of a seller is, taken by itself, an inconclusive factor. On the one hand, it becomes the principal explanation given by the seller for allegedly being forced to enter a transaction when he later attacks it. On the other hand, it is a condition a buyer may legitimately take into account in determining the price he will pay. It is not necessarily illegal to drive a hard bargain.
 
 
 17
 The mere fact that the property was conveyed for a less sum than its real value is not of itself sufficient to authorize the court to declare a deed absolute upon its face to be a mortgage. A man in embarrassed circumstances may often be compelled, by the laudable desire to pay his debts, to dispose of his property, honestly, for much less than its true value.
 
 
 18
 Pierce v. Traver, supra, 13 Nev. at 530.
 
 
 19
 The evidence fully supports a finding that El Tejon was really acting as a buyer in this case: it assumed risk; its profits were not precisely measurable in advance; and a minimum profit was not inherent in the bargain. Therefore, we cannot as a matter of law disregard the parties' characterization of this transaction as a sale.
 
 
 20
 We find unpersuasive appellee's argument that attorneys' fees should have been granted. In diversity actions, federal courts are required to follow state law in determining whether to allow attorneys' fees. See Michael-Regan Co. v. Lindell, 527 F.2d 653 at 656 (9th Cir., 1975), and cases cited therein. We note that Nevada has, by statutory enactment, severely restricted the discretion of the court in granting attorneys' fees. Nev.Rev.Stat. § 18.010(3) (1973). The Nevada Supreme Court has held that attorneys' fees may not be awarded except as prescribed by statute. City of Las Vegas v. Craign Industries, 86 Nev. 933, 941, 478 P.2d 585, 590 (1970); Dixon v. Second Judicial District Court, 44 Nev. 98, 101, 190 P. 352, 353 (1920). Nevada does, however, permit an award of attorneys' fees as an item of damages, Artistic Hairdressers, Inc. v. Levy, 87 Nev. 313, 315--16, 486 P.2d 482, 484 (1971), but such an award must be based on a showing of bad faith by the losing party, City of Las Vegas v. Craign Industries, Inc., supra, 86 Nev. at 941, 478 P.2d at 590, or special circumstances entailing undue hardship to the defendant, see e.g., Artistic Hairdressers, supra, 87 Nev. at 317, 487 P.2d at 484--85 (injunction); McIntosh v. Knox, 40 Nev. 403, 412--13, 165 P. 337, 338--39 (1917) (attachment). This determination is peculiarly within the discretion of the trial court. We are particularly impressed that the district court found it proper to deny the winning party even the full measure of its taxable costs. The trial court considered the issue carefully, and we defer to its judgment.[3]
 
 
 21
 Affirmed.
 
 
 
 *
 Honorable William B. Enright, United States District Judge, District of Southern California, sitting by designation
 
 
 [1]
 The parties intended the transaction as a lease, but put it in the form of a sale of livestock from Bidart to Swallow, apparently to comply with Bureau of Land Management regulations. All of the SRI properties had appurtenant grazing rights on federal land
 
 
 [2]
 Originally the option was for two years, but was modified to three years by subsequent agreement
 
 
 [3]
 Nor do we find error in the trial court's exclusion of certain evidence regarding the amount of licensed grazing on the Bureau of Land Management allotments appurtenant to the Swallow Ranches. In light of the substantial amount of evidence presented by both sides, the trial court properly exercised its discretion by limiting the admission of evidence